MYERS, P.J.,
 

 for the Court.
 

 ¶ 1. Jamie C. Bolden was convicted of sexual battery and sentenced to thirty years in the custody of the Mississippi Department of Corrections with ten years suspended and twenty years to serve, five years of post-release supervision, and registration as a sexual offender. He now appeals his conviction alleging the following errors: (1) he was irreparably prejudiced by improper opinion testimony; (2) violation of the witness-sequestration rule requires reversal; (3) the trial court erred in refusing the jury instruction regarding impeachment; and (4) the verdict was contrary to the weight of the evidence. We find each of these issues to be without merit; therefore, we affirm the trial court’s conviction and sentence.
 

 FACTS
 

 ¶ 2. On September 25, 2004, Demetria Moore took her eight-year-old son, E.M., to a birthday party at Patricia Bolden’s home. A.B., a nine-year-old male, and D.B., an eleven-year-old male, were also attending.
 
 [1]
 
 Patricia is Bolden’s grandmother. That night E.M. spent the night with A.B. at Patricia’s house after the party. Eighteen-year-old Bolden lived with his mother, Penny Bolden, at the house next door to where the birthday party was held. Bolden is a cousin of both A.B. and D.B., and although he is not related to E.M., all lived on Little Egypt Road in Benton County when the incident is alleged to have taken place.
 

 ¶ 3. The next day, Sunday, Demetria returned home from church and saw E.M. walking in front of their driveway with Bolden and Bolden’s two sisters. Demet-ria picked up E.M. and drove down their driveway to their home. After she and E.M. got out of the car, but before they could get inside their house, E.M. disclosed to his mother that Bolden had taken him, A.B., and D.B. into a wooded area off Little Egypt Road near a pipeline that runs through the area. E.M. told his mother that Bolden had sex with E.M. and D.B. He then forced A.B. and E.M. to have sex with each other.
 

 ¶ 4. Upon hearing this, Demetria got back into her car and went to Frank Bol-den’s house. A.B. and D.B. were sitting on the front porch of the home. She asked the boys what had happened that day, and they related the same account to Demet-ria. Demetria then traveled to Penny’s home. There, she told Penny that Bolden had “messed with” E.M. Demetria testified that Bolden’s mother had stated that “[t]his boy going to make me have a heart attack” upon hearing the news. Next, Demetria and E.M.’s father, Russell Hunt, took E.M. to the Tippah County Hospital where a rape kit was performed. Seminal fluids were found on E.M.’s buttocks.
 

 ¶ 5. At trial, the jury was shown a videotaped interview of E.M. conducted by the Family Crisis Center in Oxford approximately one week after the sexual assault. In the video, E.M. relates the same story he told his mother on the night of the incident, detailing how Bolden forced the boys to have sex with him as well as each other. The nurse who aided in the administration of the rape kit, Kelty Childs, also testified. She assisted Dr. Roger Marlin in following the protocol of the rape kit
 
 *495
 
 which involved a Woods lamp, a blue fluorescent light that makes sperm or seminal fluid glow when the overhead lights are turned off. She testified that she swabbed the area near E.M.’s rectum that had glowed under the fluorescent light and placed the swab in the rape kit package for evidence. A serologist from the Mississippi Crime Laboratory testified that the swabbed substance from the rape kit was seminal fluid. She also testified that the Woods lamp does not give false positives and only glows in relation to sperm or seminal fluid.
 

 ¶6. David Murphy with the Benton County Sheriffs Department testified that the sheriffs office had requested a DNA analysis after the serology report confirmed the presence of seminal fluid on the rape kit swabs taken from E.M. There was an insufficient sample for the Mississippi Crime Laboratory to determine the presence of DNA, but Scale Biolab, a private laboratory, was able to determine that the substance contained the DNA of E.M. and a second person. The sample was insufficient to determine the identity of the second person.
 

 ¶ 7. D.B. was called as a witness for the defense. On the stand, he testified that Bolden did not do anything to him, A.B., or E.M., but that Bolden had previously caught A.B. and E.M. in the woods and threatened to tell on them.
 
 [2]
 
 D.B. testified that he and his mother, Lisa Bolden, had met with District Attorney Ben Creek-more on the day of trial, and Lisa was upset because D.B. was going to testify against Bolden knowing he might go to jail. Lisa and Bolden’s mother are sisters and are very close. D.B. did not remember telling Creekmore that the story he had related to the Family Crisis Center in Oxford was true, or that he was angry at Bolden when he made up the accusations against him. The day of the trial was the first time that D.B. claimed the accusations he made against Bolden were false.
 

 ¶8. Pammie Davidson was called as a rebuttal witness for the State. She is the victims’ advocate coordinator for the Benton County District Attorney’s Office. Her duties include preparing victims for trial. When it became apparent that D.B. was going to recant his statement, the State asked her to leave the courtroom so it could call her as a rebuttal witness. Prior to this time, it was not anticipated that she would be called as a witness, and she was not subjected to the sequestration rule. Because of her presence in the courtroom, Bolden objected to her testimony. The prosecutor advised the trial court that she left the courtroom almost immediately after D.B. took the stand. The trial court held that she could testify, but it would entertain any contemporaneous objections if testimony contradicted the State’s position that she was an unexpected witness. Bolden did not make any such contemporaneous objections while Davidson was on the stand.
 

 ¶ 9. Davidson testified that she had been present during the conversation before trial between D.B. and his mother, Lisa. Davidson said that Lisa had become very upset when D.B. affirmed his prior statements. Lisa screamed and pointed her finger in the face of D.B., causing him to become tearful and withdrawn. Lisa told D.B. that he was making her chest hurt, she was sick to her stomach, Bolden was going to jail, and D.B. was going to help put him there. Lisa also told D.B. that Bolden’s trial was tearing the family apart.
 
 *496
 
 After the exchange, Creekmore attempted to question D.B. again, but D.B. remained very upset and shook his head “no” to all the questions he was asked, including whether his testimony would be the same. The State did not call D.B. as a witness during its case-in-chief.
 

 ¶ 10. Bolden testified in his own defense. On the stand, he claimed that he woke up Sunday around 12:40 p.m. and went to Holly Springs with his girlfriend, Hailey Crosby. He did not return home again until 11:00 or 11:20 p.m. Sunday night. Bolden was cross-examined by the State regarding his notice of alibi which stated that Bolden, Edmond Morgan, and Travis Hodges had driven from Ashland to New Albany to Holly Springs and back to Ashland on that Sunday and had not returned until after dark on the same day. Prior to trial, both Morgan and Hodges had denied being with Bolden. The State also questioned Bolden about his statement to the nurse who performed the rape kit — that he had never left the backyard that Sunday. He denied making that statement and asserted that he had been confused as to the exact date he, Morgan, and Hodges visited Holly Springs.
 

 ¶ 11. After hearing all the evidence presented, the jury convicted Bolden of sexual battery. The trial court sentenced Bolden to thirty years in the custody of the Mississippi Department of Corrections with ten years suspended, twenty years to serve, five years of post-release supervision, and registration as a sex offender. He appeals this conviction and the resulting sentence, alleging four errors.
 

 DISCUSSION
 

 I. WHETHER IMPROPER OPINION TESTIMONY CAUSED IRREPARABLE PREJUDICE.
 

 ¶ 12. The admission of expert testimony is within the sound discretion of the trial court.
 
 Seal v. Miller,
 
 605 So.2d 240, 243 (Miss.1992) (citing
 
 Hooten v. State,
 
 492 So.2d 948, 950-51 (Miss.1986)). Unless this Court can say that the trial court’s ruling was so arbitrary or clearly erroneous that it constituted an abuse of discretion, the trial court’s decision is insulated from reversal.
 
 Id.
 

 ¶ 13. Mississippi Rule of Evidence 701 states that a lay witness is limited to opinions which are “(a) rationally based on the perception of the witness, (b) helpful to the clear understanding of the testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.” Rule 702 states that an expert witness may give opinion testimony if “(1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.”
 

 ¶ 14. Bolden contends that Nurse Childs gave improper opinion testimony as to the dried secretions obtained during the administration of E.M.’s rape kit. Prior to Childs taking the stand, Bolden made an objection to her giving any type of opinion testimony about whether the substance she swabbed was seminal fluid, because she had not received any specialized training in that area. The State assured the trial court that it was only planning to ask Childs if she had used a blue light and if she detected a foreign substance that should not have been on the child’s buttocks. Given the State’s limitation, Bolden agreed to withdraw his objection.
 

 ¶ 15. During Childs’s direct examination by the State, she testified to the following:
 

 We use what is called a Woods lamp. It’s a blue floreseent light. You turn the lights low or off in the room and you use
 
 *497
 
 the blue fluorescent light and sperm or seminal fluid will usually floress [sic] and glow just a little so that you can see them easier.
 

 Bolden did not contemporaneously object to this statement by Childs. Instead, he waited until after the State had finished its direct examination to complain to the trial court that Childs had said that the Woods blue-light test is used to identify seminal fluid or sperm. The trial court responded that it did not feel that Childs rendered any opinions beyond those she was qualified to render, and it noted that defense counsel had failed to make a contemporaneous objection to the statement. The trial court advised defense counsel to question Childs on any specialized training in the area of seminal identification if counsel felt that it was needed.
 

 ¶ 16. On appeal, Bolden contends that the admission of this statement was in error because Childs gave improper lay opinion about the substances gathered from E.M. This contention is barred, however, because there was no contemporaneous objection during trial. “It is axiomatic that a litigant is required to make a timely objection,” and “if no contemporaneous objection is made, the error, if any, is waived.”
 
 Smith v. State,
 
 797 So.2d 854, 856(¶ 7) (Miss.2001). Bolden was aware of the direction the State would take with Childs’s direct examination, and he had no objection to the State questioning Childs about whether she used a blue light, detected a foreign substance, collected a sample of that substance, and sent it to the crime lab. This was essentially what the State asked Childs. Childs volunteered the information about what the Woods light is used for, but defense counsel did not object to the statement when it was made. It was not until after the entire direct examination had been completed that Bolden’s counsel challenged her statement. Even then, the objection was couched as an inquiry to the trial court of what extent defense counsel could cross-examine Childs about her qualifications without opening the door to an in-depth redirect by the State. It was not an outright objection to her statements, or even a request for a limiting instruction to the jury; it was an inquiry as to how far defense counsel could question her as to her qualifications without opening the door to further questioning by the State as to the dried secretions. Thus, the objection was not properly preserved by Bolden at trial.
 

 ¶ 17. However, even if there had been a contemporaneous objection by Bol-den to Childs’s statements, it would not have been reversible error for the trial court to allow the testimony. The State questioned Childs regarding hospital protocol in administering a rape kit, which was within her personal knowledge as she had worked at the hospital as a nurse for six years. As a nurse, she personally assisted Dr. Marlin in performing the rape kit.
 
 See Moody v. State,
 
 841 So.2d 1067, 1093-94 (¶¶ 80-82) (Miss.2003) (nurse who personally observed the taking of vaginal swabs during an autopsy had personal knowledge regarding the procedure used by the doctor in doing the autopsy).
 

 ¶ 18. Also, the trial court correctly noted that Childs did not give any opinions beyond what she was qualified to render. This Court dealt with a similar issue in
 
 Marbra v. State,
 
 904 So.2d 1169 (Miss.Ct.App.2004). In that case, Marbra challenged the admissibility of testimony by a firearms specialist and a sergeant who took part in the investigation. This Court held that even though the firearms specialist, who was employed by the Mississippi Crime Laboratory, was not qualified by the trial court as an expert, his testimony was properly admitted because the witness
 
 *498
 
 did not give an opinion, much less an expert opinion, at any point during his testimony.
 
 Id.
 
 at 1174-75(¶ 16). He only testified as to the results of an accidental-firing experiment he performed to test the defendant’s claim that the shooting had been accidental.
 
 Id.
 
 All of this information was found in his report, which had been given to the defense.
 
 Id.
 
 The specialist did not give an expert opinion or any opinion during his testimony.
 

 ¶ 19. Also in the
 
 Marbra
 
 case, the testimony of a sergeant who took part in the investigation was challenged. The sergeant testified that if a person held a gun in the manner which the defendant claimed, gunpowder residue would be present on that person’s hand after the gun was discharged.
 
 Id.
 
 at 1177(¶ 30). This Court found the evidence was properly admitted under Rule 701 because it was based on his experience and perception as a law enforcement officer, and it helped the jury to determine the material issue of whether the gun had fired accidently.
 
 Id.
 
 at (¶ 33).
 

 ¶ 20. Similarly, Childs did not testify as to whether, in her opinion, the dried secretions found on E.M.’s buttocks were seminal fluid. She testified as to the purpose of using a Woods lamp. This knowledge was gained through her experiences and observations over six years as a nurse. It helped the jury understand the process by which the evidence was gathered and analyzed. She did not state that the dried secretions were seminal fluid; she only stated that a foreign substance was found by a process that is used to detect seminal fluid. This was not an opinion, and it was gained through her personal observation and experiences. The trial court, therefore, did not err in allowing the testimony.
 

 ¶ 21. Finally, assuming that a contemporaneous objection had been made to Childs’s statements and her testimony did constitute reversible error, the information relayed to the jury through her testimony was harmless. This Court will not reverse unless there has been both an abuse of discretion and prejudice to the defendant.
 
 White v. State,
 
 847 So.2d 886, 892(¶ 23) (Miss.Ct.App.2002). There was no prejudice to the defendant in this case because a serologist from the Mississippi Crime Laboratory, who was qualified as an expert by the trial court, testified that the substance swabbed was, in fact, seminal fluid. Thus, even if Childs had only said that they used a blue light to highlight secretions on the skin, the fact that the matter was seminal fluid would have been properly disclosed to the jury by the serol-ogist. Thus, this issue is without merit.
 

 II. WHETHER A VIOLATION OF THE SEQUESTRATION RULE REQUIRES REVERSAL.
 

 ¶ 22. Bolden contends that the testimony of Davidson, the victim’s advocate, was improper because she was allowed to sit in on the majority of the trial in violation of the sequestration rule. Davidson was called to rebut the testimony of D.B., who testified for the defense and stated that Bolden did not sexually assault him or the other boys. Davidson relayed to the jury that she had witnessed an argument between D.B. and his mother, in which D.B.’s mother told him that he was putting his cousin Bolden in prison and tearing their family apart. After this exchange, D.B. became sullen and withdrawn and indicated that he was going to change his testimony. When D.B. took the stand for the defense, he recanted his prior statements implicating Bolden and stated that the other boys had made up the accusations after Bolden caught them in the woods.
 

 ¶ 23. Mississippi Rule of Evidence 615 requires that the trial court, at the request of either party or upon its own motion,
 
 *499
 
 exclude all witnesses so that they cannot hear the testimony of other witnesses unless that witness is also: (1) a party, if that party is a natural person, (2) an officer or employee, designated by the attorney as the representative of a party, if the party is not a natural person, or (3) a person whose presence has been shown to be essential to the presentation of a party’s case.
 

 ¶ 24. “The purpose of the rule is to prevent a witness from adapting his/ her testimony to previous testimony.”
 
 Kiker v. State,
 
 919 So.2d 190, 194(¶8) (Miss.Ct.App.2005) (citing
 
 Douglas v. State,
 
 525 So.2d 1312, 1316 (Miss.1988)). The rule applies equally to rebuttal witnesses and ease-in-chief witnesses.
 
 Finley v. State,
 
 725 So.2d 226, 233(¶21) (Miss. 1998). This Court is limited to an abuse of discretion standard when reviewing an alleged sequestration violation.
 
 Whittington v. State,
 
 748 So.2d 716, 719(¶ 19) (Miss.1999). A defendant must show on appeal that the trial court not only abused its discretion, but also that the error caused prejudice to his defense.
 
 Finley,
 
 725 So.2d at 233(¶22). This Court will not simply reverse a trial court for failing to either declare a mistrial or exclude testimony after a sequestration violation.
 
 Id.
 

 ¶ 25. Once a witness has violated the sequestration rule, the appropriate remedy is within the trial court’s sound discretion.
 
 Id.
 
 at (¶ 23). Such remedies can include:
 

 prospectively excluding the witness where prejudice will otherwise ensue; striking the witness’s testimony where connivance gave rise to the testimony; striking the witness’s testimony where the testimony gave rise to prejudice; or, most appropriately, allowing the other party to subject the witness to a “full-bore cross-examination” on the facts of the rule violation. The court may also instruct the jury that it may consider the rule violation when the jury evaluates the violating witness’s credibility.
 

 Baine v. State,
 
 606 So.2d 1076, 1083 (Miss.1992) (internal citations omitted).
 

 ¶ 26. In the instant case, the trial court allowed Davidson to testify because she was an unanticipated witness who left the courtroom as soon as it became apparent to the State that she would be called as a rebuttal witness. The trial court noted that it would entertain any contemporaneous objections to testimony that indicated Davidson had known she was going to be a witness or had adapted her testimony as a result of not being subjected to the sequestration rule. There were no objections by the defense during Davidson’s direct examination concerning any sequestration violations.
 

 ¶27. These facts are very similar to those of
 
 Kiker,
 
 where this Court held there was no undue prejudice to a defendant when a deputy was called as a rebuttal witness by State after sitting in on most of the State’s case-in-chief. 919 So.2d at 195(¶ 11). The deputy left the courtroom as soon as it became apparent that he would be needed as a rebuttal witness, and he was not in the courtroom during the testimony of the witness he was being called to rebut.
 
 Id.
 
 This Court reasoned that those precautions prevented prejudice to the defendant and upheld the trial court’s decision to allow the deputy to testify.
 
 See id.
 

 ¶ 28. Likewise, Davidson was not present during the majority of D.B.’s testimony. Her testimony was not based upon anything which could have been tailored by hearing other parts of the State’s casein-chief. Her statements were limited to the interaction between D.B. and his mother. She did not testify as to anything that could have been adapted from hearing oth
 
 *500
 
 er witnesses. Also, the only objection made by the defense during Davidson’s direct examination was that a portion of a question involved hearsay, and the State withdrew that portion of the question. The defense also had the opportunity to cross-examine Davidson, which it employed to question her regarding her interaction with D.B. and his mother. Therefore, we find that allowing Davidson to testify was not an abuse of discretion by the trial court, and this issue is without merit.
 

 III. WHETHER THE TRIAL COURT ERRED IN REFUSING THE JURY INSTRUCTION REGARDING IMPEACHMENT.
 

 ¶ 29. Bolden contends that the trial court erred in refusing to allow the proposed jury instruction regarding impeachment evidence. The supreme court has long held that:
 

 The refusal of a timely requested and correctly phrased jury instruction on a genuine issue of material fact is proper, only if the trial court — and this Court on appeal — can say, taking the evidence in the light most favorable to the party requesting the instruction, and considering all reasonable favorable inferences which may be drawn from the evidence in favor of the requesting party, that no hypothetical, reasonable jury could find the facts in accordance with the theory of the requested instruction.
 

 Hill v. Dunaway,
 
 487 So.2d 807, 809 (Miss.1986). On review, jury instructions should be taken as a whole with all jury instructions being read together and not taking a single instruction out of context.
 
 Ellis v. State,
 
 790 So.2d 813, 815(¶5) (Miss.2001) (quoting
 
 Higgins v. State,
 
 725 So.2d 220, 223(¶ 16) (Miss.1998)). “A defendant is entitled to have jury instructions given which present his theory of the case; however, this entitlement is limited in that the court may refuse an instruction which incorrectly states the law, is fairly covered elsewhere in the instructions, or is without foundation in the evidence.”
 
 Id.
 

 ¶ 30. Bolden relies on the cases of
 
 Fer-rill v. State,
 
 643 So.2d 501, 505 (Miss.1994), and
 
 McGee v. State,
 
 608 So.2d 1129, 1134 (Miss.1992), to support his contention that the refusal of the impeachment jury instruction was reversible error.
 

 ¶ 31. Bolden’s proposed instruction reads:
 

 The Court instructs the jury that the testimony of a witness or witnesses may be discredited or impeached by showing that on a prior occasion they have made a statement which is now inconsistent with or contradictory to their testimony in this case. In order to have this effect, the inconsistent or contradictory prior statement must involve matter which is material to the issues in this case.
 

 The prior statement of the witness or witnesses can be considered by you only for the purpose of determining the weight or believability that you give to the testimony of the witness or witnesses that made them. You may not consider the prior statement as proving the guilt or innocence of the defendant.
 

 This proposed instruction is almost identical to those instructions not given in
 
 Fer-rill
 
 and
 
 McGee
 
 that were held to be necessary, warranting reversal and a new trial. However, Bolden relies on an incomplete statement of holdings in these cases. The supreme court has held that “the trial court’s general instruction that the jury determine the weight and credibility of a witness’s testimony, coupled with cross-examination of the witness concerning the inconsistent statement and closing arguments drawing attention to the inconsistencies is sufficient to remove error from the refusal to give an impeachment in
 
 *501
 
 struction.”
 
 Harris v. State,
 
 861 So.2d 1003, 1020(¶ 48) (Miss.2003) (citing
 
 Swann v. State,
 
 806 So.2d 1111, 1117 (¶¶ 23-24) (Miss.2002)).
 

 ¶ 32. All three of the above requirements were satisfied in this case. First, jury instruction C-l, which was given to the jury, was the trial court’s general instruction that the jury determine the weight and credibility of a witness’s testimony:
 

 You are the sole judges of the facts in this case. Your exclusive province is to determine what weight and credibility will be assigned the testimony and supporting evidence of each witness. You are required and expected to use your good common sense and sound judgment in considering and weighing the testimony of each witness who has testified.
 

 This section of the trial court’s general instructions to the jury sufficiently covers the areas of weight and credibility of witnesses in this case.
 

 ¶ 33. Second, each witness impeached with prior inconsistent statements was thoroughly cross-examined by the State and rehabilitated by the defense about these prior inconsistent statements.
 
 [3]
 
 Specifically, the State cross-examined D.B. in depth about why his story about the alleged sexual abuse had changed the day of trial. The defense attempted to explain this by showing that D.B. was angry at Bolden at the time he made the accusations. Finally, the State was given ample opportunity to cross-examine Bolden concerning the change of his alibi three times during the trial process. Bolden was allowed to explain why these discrepancies existed. Therefore, each was given an opportunity to explain or explore thoroughly the prior inconsistencies during trial.
 

 ¶ 34. Third, the closing arguments of both parties referred to the prior inconsistent statements and attempted to explain those inconsistencies in a way that supported that party’s proposed explanation of the events on that day. Because other jury instructions discussed the matters of weight and credibility of the evidence, all impeached witnesses were questioned about the inconsistencies, and both closing arguments addressed the inconsistencies, we cannot say that the refusal of the proposed jury instruction was reversible error when taken in context with all other jury instructions. Thus, this issue is without merit.
 

 IY. WHETHER THE VERDICT WAS CONTRARY TO THE OVERWHELMING WEIGHT OF THE EVIDENCE.
 

 ¶ 35. Bolden’s final contention is that the verdict was contrary to the overwhelming weight of the evidence. The appropriate standard of review for an objection to the weight of the evidence is whether the verdict “is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.”
 
 Bush v. State,
 
 895 So.2d 836, 844(¶ 18) (Miss.2005) (citing
 
 Herring v. State,
 
 691 So.2d 948, 957 (Miss.1997)). The supreme court has consistent ly held that an appellate court “sits as a thirteenth juror. The motion, however, is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily
 
 *502
 
 against the verdict.”
 
 Id.
 
 (quoting
 
 Amiker v. Drugs For Less, Inc.,
 
 796 So.2d 942, 947(¶ 18) (Miss.2000)). All “evidence should be weighed in the light most favorable to the verdict.”
 
 Id.
 
 (citing
 
 Herring,
 
 691 So.2d at 957).
 

 ¶ 36. Sitting as a thirteenth juror, this Court cannot find that the jury’s verdict amounted to an unconscionable injustice, nor can we find that this is an exceptional case where the evidence preponderates heavily against the verdict. The State presented ample evidence to support a guilty verdict. Examples of this evidence include the testimony of the victim, the victim’s mother, the nurse who examined the victim on the night of the attack, a serologist who determined that the dried secretion found on the buttocks of the victim was seminal fluid, and members of the police department that participated in the investigations. The victim maintained a largely consistent story from his first reports to his testimony on the stand. All of the State’s witnesses presented testimony that implicated Bolden. Even though there was some conflicting evidence presented by the defense and the defendant presented an alibi, the evidence presented by the State was of such a level that we find that the guilty verdict was not against the overwhelming weight of the evidence. This issue is without merit.
 

 ¶ 37. THE JUDGMENT OF THE CIRCUIT COURT OF BENTON COUNTY OF CONVICTION OF SEXUAL BATTERY AND SENTENCE OF THIRTY YEARS IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS WITH TEN YEARS SUSPENDED, TWENTY YEARS TO SERVE, FIVE YEARS OF POST-RELEASE SUPERVISION, AND REGISTRATION AS A SEX OFFENDER IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO BENTON COUNTY.
 

 KING, C.J., LEE, P.J., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR.
 

 [1]
 

 . Initials of the minor victims are used to protect the their identities.
 

 [2]
 

 . Bolden later alleged that he caught A.B. and E.M. having sex in the woods, leading them to falsely accuse him of sexual assault.
 

 [3]
 

 . This section of the analysis will be slightly different because in the
 
 Harris
 
 and
 
 Swann
 
 cases, the impeached witness was called by the State, but here it was Bolden who called the impeached witnesses and attempted to explain away their prior inconsistent statements. Therefore, it is necessary to make sure each party was given an opportunity to explore the prior inconsistencies.