CARLTON, J.,
for the Court:
¶ 1. On March 1, 2010, an Attala County grand jury indicted Justin James (James) and Detrius Roberson (Roberson) (collectively Defendants) on the following charges: Count I, armed robbery in violation of Mississippi Code Annotated section 97-3-79 (Rev.2006); Count II, manslaughter in violation of Mississippi Code Annotated section 97-3-47 (Rev.2006); Count III, aggravated assault in violation of Mississippi Code Annotated section 97-3-7(2)(a) (Rev.2006); Count IV, aggravated assault in violation of section 97-3-7(2)(a); and Count V, conspiracy to commit armed robbery in violation of Mississippi Code Annotated section 97-1-1 (Supp.2013). Defendants were both convicted on all five counts. On appeal, Defendants raise the following issues: (1) whether the trial court erred by refusing Roberson’s jury instruction as to the weight of the evidence; (2) whether the trial court erred by refusing Defendants’ jury instruction as to accomplice testimony; (3) whether the trial court erred by refusing James’s jury instruction as to his theory of the case; (4) whether the trial court’s form of the verdict was erroneously worded; and (5) whether juror misconduct denied Defendants a fair and impartial trial. Finding no error, we affirm.
FACTS
¶ 2. On November 14, 2008, a robbery occurred at the Hill Brothers Logging Shop (Logging Shop) in Kosciusko, Mississippi, where several people had gathered to play cards, drink beer, and socialize. Upon hearing a knock at the door around 11 p.m., Jimmy Cook (Cook) went to the door and asked who was outside, but no one answered. Around the same time, Keith Holt (Holt) parked his truck outside the Logging Shop and witnessed four masked men with guns run away from the Logging Shop’s front door. Holt saw the men hide behind a nearby truck.
¶ 3. Ricky Hill (Ricky) and Jim Hill (Jim) exited the Logging Shop to see who was outside. Holt relayed what he had seen to Ricky, and Ricky walked toward the truck where the men had hidden. As Ricky made his way to the truck, one of the masked men pointed a gun at Ricky’s face and instructed him to drop to his knees and crawl back into the Logging Shop. Another masked man chased Jim into the Logging Shop. Several shots were fired into the Logging Shop, and the masked men demanded money from the people inside the Logging Shop. The gunfire resulted in injuries to Cook and Donnie Elmore (Elmore) and in the death of Jessie Earl Hill (Jessie). During the robbery, one robber’s mask slipped, revealing the man’s face. Ricky identified the man as Barry Love (Love).
¶ 4. Following his arrest, Love admitted his involvement in the robbery and identified James, Roberson, and Robert Landfair (Landfair) as his fellow conspirators. The police arrested all three men, and James and Roberson, Defendants in this appeal, were jointly indicted and tried. Prior to Defendants’ trial, Landfair pleaded guilty. Two months after Defendants’ trial, Love was tried and convicted.
¶ 6. On March 1, 2010, a grand jury indicted Defendants on five counts: Count I, armed robbery in violation of section 97-3-79; Count II, manslaughter in violation of section 97-3-47; Count III, aggravated assault in violation of section 97-3-7(2)(a); Count IV, aggravated assault in violation of section 97-3-7(2)(a); and Count V, conspiracy to commit armed robbery in violation of section 97-1-1.
¶ 6. Defendants’ trial began on September 20, 2010. In addition to the testimony of several eyewitnesses who were at the Logging Shop on the night of the robbery, *988 the State called Love to testify against Defendants. Love testified that Roberson called him the day of the shooting to enlist him in a plan to get money back from a person with whom Roberson had previously had an altercation. Roberson told Love that the person would be at the Logging Shop on the night in question. Around 9:30 p.m. or 10 p.m. that night, Roberson, James, and Landfair picked Love up in a white Cadillac driven by James, and the men proceeded to the Logging Shop.
¶ 7. According to Love’s testimony, James parked the white Cadillac on a dirt road near the Logging Shop, and the four men concealed their faces and grabbed firearms from the car trunk. The men then made their way to the Logging Shop, and James called Jimmy Fletcher (Fletcher), who was inside the Logging Shop. Love testified that James asked Fletcher whether any guns were inside the Logging Shop, and Fletcher responded that no guns were inside the building. Roberson then knocked on the locked front door. A voice from within the Logging Shop asked who was outside, but none of the men answered. At this point Holt pulled into the parking lot, and the four men hid.
¶ 8. Love testified that James was the robber who pointed his gun at Ricky’s head and forced Ricky to crawl back into the Logging Shop. Love further testified that James, Roberson, and Landfair all fired shots into the building but that he (Love) neither fired shots nor stepped fully through the building’s doorway. Following the shooting, Love claimed that Land-fair fled on foot while the other three men made their way back to the Cadillac. When Love returned home, his mother informed him that the police were looking for him. Love called the police and then went to the sheriffs department the next morning. He provided the police with a statement identifying himself, James, Roberson, and Landfair as the men involved in the robbery.
¶ 9. During the trial, Defendants’ attorneys impeached Love on the following points: (1) which gun Love carried with him to the Logging Shop; (2) where Love stood during the shooting; and (3) whether Love fired any shots into the building during the robbery. In a prior statement signed by Love, he stated that he had a 9-millimeter handgun with him during the robbery. A second signed statement to police said that Love carried a 12-gauge shotgun with him and fired into the Logging Shop three times. At trial, however, Love testified that he chose a ,.40-caliber handgun from the weapons in the car trunk and that he never fired shots into the Logging Shop.
¶ 10. Other witness testimony differed from Love’s as to which of the four shooters actually stood in the door and fired the first shots. According to Love’s testimony at trial, he never fired shots into the building and, at most, had one foot inside the building’s doorway. Ricky testified, however, that as he crawled back to the Logging Shop, he saw Love step into the building and fire three or four shots inside. Ricky further testified that Love appeared to be holding a shotgun or a rifle.
¶ 11. Despite the discrepancies between Love’s testimony at trial and his prior statements, as well as between Love’s testimony and that of other witnesses, the State argues in its brief that Love consistently maintained that he, James, Roberson, and Landfair committed the robbery. The State further argues that other evidence presented at trial substantially corroborated Love’s testimony. Both Holt and Regina Hill Coates (Regina), a daughter of the deceased victim, Jessie, testified that they saw a white Cadillac parked near the Logging Shop before the shooting. Regina stated that she saw a white Gad- *989 iliac parked on a nearby road as she drove to the Logging Shop the night of the robbery and that she saw four heads in the parked car. Police also recovered an unspent 9-millimeter round when they searched James’s car, a white Cadillac. In both his signed statements to police and his trial testimony, Love consistently maintained that Roberson carried a Tec-9 handgun the night of the robbery. Although no 9~millimeter rounds were found at the Logging Shop, the State asserts that the discovery of the unspent round in James’s car “corroborates Love’s assertion that Roberson was armed with a Tec-9, which uses 9[-millimeter] ammunition.”
¶ 12. The State also argues that the subpoenaed phone records of the four men supports Love’s testimony. According to Love’s testimony, Roberson called him when he, James, and Landfair arrived outside Love’s house to pick Love up. The State contends that this was likely the phone call made from Roberson’s phone to Love’s phone at 10:17 p.m. The State also argues that a call made from James’s phone at 10:52 p.m., about ten minutes before the shooting, was likely the call made to Fletcher to see whether anyone inside the Logging Shop had a gun.
¶ 13. Love also testified that Landfair escaped on foot after the shooting while the other three men returned to the car. The subpoenaed phone records reflect that between 11:02 p.m. and 12:22 a.m. Roberson made fourteen calls to Landfair’s cell phone. Love further testified that he and James dropped Roberson off so that Roberson could get his mother’s vehicle. Then Love and James dropped off James’s vehicle, set out on foot, and met Roberson in front of a club. The State asserts that this part of Love’s testimony is also corroborated by the phone records, which show that James and Roberson called each other five times between 12:22 a.m. and 12:42 a.m.
¶ 14. At Defendants’ trial, Roberson and two of his friends testified that Roberson was at a bar when the shooting occurred. While on the witness stand, Roberson further claimed that he did not have his cell phone the night of the shooting. Despite the phone records showing that he called Love’s phone seven times before the shooting, Roberson also testified that he and Love had a bad history and that it would have been unusual for him to contact Love.
¶ 15. Another witness at Defendants’ trial, Keshia Windom (Windom), testified and provided an alibi for James. James is the father of one of Windom’s children, who was three months old at the time of the shooting. Windom testified that James came to see his three-month-old baby at 10 p.m. the night of the shooting and stayed until 11:30 p.m. However, in a statement made by Love to the police, which Defendants offered into evidence, Love said that James called Windom before the shooting and “said if anything went down for her to say she was with him.”
¶ 16. After hearing the testimony and considering the evidence presented, a jury found James and Roberson guilty of all five counts charged in their indictment. The trial judge ordered James to serve a term of twenty years in the custody of the Mississippi Department of Corrections (MDOC) for each of the first four counts charged in his indictment and to serve a term of five years in the custody of MDOC for Count V; with the sentence in Count I to run consecutively to the sentences in Counts II, III, and IV; with the sentence in Count III to run concurrently with the sentence in Count II; with the sentence in Count IV to run consecutively to the sentences in Counts II and III; and with the *990 sentence in Count V to run concurrently with the sentences in Counts I, II, III, and IV. The trial judge ordered Roberson to serve a terna of twenty years in the custody of MDOC for each of the first four counts charged in his indictment and to serve a term of five years in the custody of MDOC for Count V; with the sentence in Count I to run consecutively to the sentences in Counts II, III, and IV; with the sentence in Count III to run consecutively to the sentence in Count II; with the sentence in Count IV to run concurrently with the sentences in Counts II and III; and with the sentence in Count V to run concurrently with the sentences in Counts I, II, III, and IV.
¶ 17. On October 29, 2010, James filed a motion for a judgment notwithstanding the verdict (JNOV) or, in the alternative, a motion for a new trial. On November 3, 2010, Roberson filed an amended motion for a JNOV or, in the alternative, a motion for a new trial, setting forth allegations that mirrored those in James’s motion. In their motions, Defendants alleged that the trial court denied their right to a fair trial by not removing Hattie Mae McLaurin (McLaurin)[1] and other jurors who failed to acknowledge during voir dire that they knew the family of the deceased victim. Defendants asserted that their right to a fair trial was also denied by the State’s use of perjured testimony. In addition, Defendants claimed that the trial court erred by giving the State’s defective accomplice jury instruction and that the State failed to prove its case beyond a reasonable doubt.
¶ 18. The trial judge entered an order on January 10, 2011, denying Defendants’ motions. Defendants then filed a motion on January 28, 2011, for a rehearing and reconsideration of their motion for a JNOV or, in the alternative, a new trial. In the alternative, they filed a second motion for a new trial. Defendants based their motion on newly discovered evidence. An attached affidavit signed by Erica Barnes (Barnes), a juror in the case, stated that Barnes had worked at Wal-Mart with two daughters of Jessie, the victim killed in the armed robbery. The affidavit further stated that, upon recognizing the victim’s daughters, Barnes was unable to remain fair and impartial during the trial. Barnes’s affidavit also stated that she did not make the trial court aware of her inability to remain fair and impartial because she believed that it was too late to raise her concern once the trial began.
¶ 19. Defendants’ motion was also accompanied by an affidavit signed by Roberson’s attorney. This second affidavit stated that Barnes’s husband had contacted the attorney and informed him that his wife, Barnes, had realized during the early stages of the trial that she knew some of the victim’s family. Barnes’s husband further informed the attorney that, because of this realization, Barnes determined that she could not be a fair juror in the trial. Following this conversation, Roberson’s attorney sent his investigator to see Barnes around January 13, 2011, and to secure an affidavit from her.
¶ 20. On February 2, 2011, the trial judge entered an order denying Defendants’ motion for reconsideration and their second motion for a new trial. Regarding Barnes’s affidavit, the trial judge wrote the following:
Barnes testified at the [hearing on the] first motion for [a] new trial and was adamant that she had no more than a passing relationship with the Hills. She *991 neglected to use that opportunity to inform the [c]ourt of her inability to be fair and impartial. The [c]ourt, having had the opportunity to observe Barnes’[s] testimony and review a transcript of the same, finds the present affidavit to be inconsistent with her pri- or testimony. In addition counsel for the Defendants!,] by obtaining the affidavit without notice to the [c]ourt or opposing counsel!,] failed to follow long-established procedure. To say that the present affidavit is suspect is a gross understatement.
The trial judge further determined that case law and Rule 606(b) of the Mississippi Rules of Evidence prohibited him from considering the affidavit. Because he found that Defendants had failed to present any new evidence that he could consider, the trial judge denied the motion.
¶ 21. Following the trial court’s ruling, Defendants appealed. In them briefs they assert the following issues: (1) whether the trial court erred by refusing Roberson’s jury instruction as to the weight of the evidence; (2) whether the trial court erred by refusing Defendants’ jury instruction as to accomplice testimony; (3) whether the trial court erred by refusing James’s jury instruction as to his theory of the case; (4) whether the trial court’s form of the verdict was erroneously worded; and (5) whether juror misconduct denied Defendants a fair and impartial trial.
DISCUSSION
¶ 22. Upon review, we have consolidated Defendants’ assignments of error for consideration. In their first three assignments of error, Defendants assert that the trial court erred by refusing certain jury instructions proposed by one or both Defendants. Relevant to Defendants’ assignments of error, the following jury instructions were given at trial:
Jury Instruction No. 1
You have heard all of the testimony and received the evidence and will hear the arguments of counsel shortly.... It is your exclusive province to determine the facts in this case and to consider and weigh the evidence for that purpose. The authority thus vested in you is not arbitrary power, but must be exercised with sincere judgment, sound discretion and in accordance with the rules of law. Both parties have a right to expect that you will conscientiously consider and weigh the evidence and apply the law of the case. It is your duty to determine the facts and to determine them from the evidence produced in open court. You are to apply the law to the facts and in this way decide the case. You should not be influenced by bias, sympathy, or prejudice. Your verdict should be based on the evidence and not upon speculation, guesswork, or conjecture. You are required and expected to use your good common sense and sound!,] honest judgment in considering and weighing the testimony of each witness who has testified in this case....
Jury Instruction No. 4
The [c]ourt instructs the [j]ury that Barry Love is an accomplice! ] in this case!,] and the .testimony of an accomplice is to be considered and weighed with great care and caution. You may give it such weight and credit as you deem it is entitled.
Jury Instruction No. 7
“Alibi” means elsewhere or in another place. In this case, the !D]efendant is asserting the defense of alibi by saying at the time of the alleged incidents at the [Hill Brothers] Shop the [Defendant was with Keshia Win *992 dom. “Alibi” is a legal and proper defense in law. The [Defendant is not required to establish the truth of the alibi to your satisfaction, but if the evidence or lack of evidence in this case raises in the minds of the jury a reasonable doubt as to whether the [D]e-fendant was present and committed the crime, then you must give the [Defendant the benefit of any reasonable doubt and find the [Defendant not guilty.
(Emphasis added).
I. Whether the trial court erred by refusing Roberson’s jury instruction as to the weight of the evidence.
¶ 23. Roberson claims that the trial court erred by refusing jury instruction 1, his requested jury instruction regarding the weight to be given to witness testimony, which mirrored the language provided in the model jury instruction. Roberson’s proposed jury instruction stated:
Each person testifying under oath is a witness. You have the duty to determine the believability of the witnesses. In performing this duty, you must consider each witnesses] intelligence, the witnesses] ability to observe and accurately remember, the [witness’s] sincerity, and the witnesses] demeanor while testifying. You must consider also the extent the witness is either supported or contradicted by other evidence, the relationship the witness may have with either side, and how the witness might be affected by the verdict. You must consider any evidence of the witnesses] character for truthfulness. In weighing a discrepancy by a witness or between witnesses, you should consider whether it resulted from an innocent mistake or a deliberate falsehood, and whether it pertains to a matter of importance or an unimportant detail. You may reject or accept all or any part of a witnesses] testimony!,] and you may reject part and accept other parts of a witnesses] testimony. After making your own judgment, you will give the testimony of each witness the credibility, if any, as you may think it deserves.
¶ 24. With regard to jury instructions, this Court has previously stated:
The failure of a court to give a requested instruction does not provide grounds for reversal if the jury was fairly, fully[,] and accurately instructed on the law governing the case. Smith v. State, 572 So.2d 847, 849 (Miss.1990). The standard requires reviewing jury instructions by reading all instructions together, rather than reading each instruction in isolation. Townsend v. State, 681 So.2d 497, 509 (Miss.1996).... Where one jury instruction adequately covers the defendant’s theory of self-defense, there is no error in refusal of a second or redundant instruction.” Higgins v. State, 725 So.2d 220[, 223] (¶ 19) (Miss. 1998); Cook v. State, 467 So.2d 203, 210 (Miss.1985); Evans v. State, 457 So.2d 957, 959 (Miss.1984); see also Murphy v. State, 566 So.2d 1201, 1206 (Miss.1990) (holding that the trial court may refuse an instruction which is without foundation in the evidence, incorrectly states the law, or is provided in another instruction); Calhoun v. State, 526 So.2d 531, 533 (Miss.1988) (holding that a trial court is not obligated to instruct a jury over and over on the same concept of law despite variations in different instructions).
Holmes v. State, 754 So.2d 529, 537 (¶¶ 20-21) (Miss.Ct.App.1999).
¶ 25. The State argues that Roberson’s refused jury instruction only informed jurors of their duty “to assess witness credibility and resolve any conflicts [that] may *993 have arisen in the testimony.” The State further asserts that the trial court properly refused Roberson’s instruction since the trial court gave jury instruction 1, which properly covered the issue by stating in pertinent part that “[i]t is your exclusive province to determine the facts in this case and to consider and weigh the evidence for that purpose.... You are required and expected to use your good common sense and sound[,] honest judgment in considering and weighing the testimony of each witness who has testified in this case.”
¶ 26. In addition, the State notes that the trial court gave jury instruction 8, which was requested by Defendants and stated that “[y]ou have heard evidence that a witness made a statement prior to trial that may be inconsistent with their [sic] testimony at this trial. If you believe that an inconsistent statement was made, you may consider the inconsistency in evaluating the believability of the witnesses] testimony.” Also, jury instruction 4 told the jurors to treat Love’s testimony with “such weight and credit as you deem it is entitled.” In light of jury instructions 1, 4, and 8, the State argues that Roberson’s proposed instruction was fully and fairly covered and that the jury received adequate instruction regarding its duty to assess witness credibility and to resolve any conflicts within the testimony. The State thus contends that the trial court properly refused Roberson’s instruction.
¶ 27. Reading all the given instructions together, we agree that the jury was fairly, fully, and accurately instructed regarding its duty to consider and weigh the credibility of witness testimony. Accordingly, we find that this issue lacks merit.
II. Whether the trial court erred by refusing Defendants’ jury instruction as to accomplice testimony.
¶ 28. At trial Defendants’ attorneys objected to jury instruction 4 regarding accomplice testimony. Defendants’ attorneys stated that their proposed instruction was more appropriate, and they thought that even the model jury instruction went further than the instruction approved by the trial court. However, the trial court refused Defendants’ proposed accomplice instruction, stating that the State’s proposed instruction was the one approved by the Mississippi Supreme Court. Defendants now argue on appeal that the trial court erred by giving the State’s proposed jury instruction rather than their own nearly three-page-long instruction.
¶ 29. Roberson argues that Love’s testimony was not only uncorroborated by other witness testimony but also inconsistent with other prior statements that Love made. Roberson cites the supreme court case Wheeler v. State, 560 So.2d 171 (Miss. 1990), in support of his argument that the trial court erred in refusing Defendants’ proposed jury instruction regarding accomplice testimony. Roberson argues that a primary concern in Wheeler was the failure of the lower courts to present juries with a clear instruction that accomplice testimony should be viewed with suspicion, particularly where the testimony was uncorroborated. Roberson contends that “Love’s contradictory statements as to his own role, and his uncorroborated testimony about ... Roberson, epitomize the concerns raised by the [Mississippi Supreme] Court in Wheeler.”
¶ 30. James’s argument rests upon his contention that Defendants’ jury instruction was a more complete and explanatory accomplice instruction. He argues that Defendants’ instruction provided more court-approved reasons on how the jury should view accomplice testimony and why it should view such testimony that way. *994 James also alleged that Defendants’ instruction was the only one that alerted the jury as to an accomplice’s motive for testifying and that the State’s instruction proved inadequate because it simply defined an accomplice.
¶ 81. In response to Defendants’ arguments, the State asserts that Mississippi case law only requires a cautionary accomplice instruction where the State provides uncorroborated accomplice testimony. The State argues that, because it put forth other evidence to support and corroborate Love’s accomplice testimony, such as phone records and eyewitness testimony, then Defendants received more than they were entitled to by the trial court’s giving of any accomplice instruction at all. The State also argues that each of the ten paragraphs in Defendants’ accomplice instruction simply informed the jury that it should view accomplice testimony with great care and caution, which jury instruction 4 adequately stated in a few sentences.
¶ 32. The supreme court has stated:
Clear law in ... Mississippi is that the jury is to regard the testimony of co-conspirators with great caution and suspicion. When determining whether a defendant is entitled to such a cautionary instruction, the trial judge considers whether the witness was in fact an accomplice and whether the witness’s testimony was corroborated. Although [giving] a cautionary instruction regarding the testimony of an accomplice is within the trial judge’s discretion, such an instruction is required when the accomplice’s testimony is the sole basis for the conviction, and the defendant’s guilt is not clearly proven.
Williams v. State, 32 So.3d 486, 490 (¶ 12) (Miss.2010) (internal citations and quotation marks omitted). “The controlling principle is that the uncorroborated testimony of an accomplice may be sufficient to convict an accused. However, the general rule is inapplicable in those cases where the testimony is unreasonable, self[-]eon-tradictory[,] or substantially impeached.” Id. at (¶ 14) (citation and internal quotation marks omitted). “In such cases, the trial court must direct a verdict of not guilty.” Id. (citation omitted).
¶ 33. In Williams the supreme court emphasized the distinction between these two tests and stated that the “test for whether evidence is sufficient to support a conviction is more stringent than the test for whether the evidence warrants a cautionary jury instruction.” Id. at (¶ 15). “In the first instance, the case never reaches the jury, and the defendant is acquitted.” Id. (citation omitted). “In the second instance, the jury is permitted to find the defendant guilty or not guilty, but is instructed that the uncorroborated testimony of an accomplice should be regarded with great caution and suspicion.” Id. at 490-91 (¶ 15) (citation omitted). While recognizing that these two tests had previously been confused with one another, the supreme court clarified “that for a defendant to be entitled to a cautionary jury instruction, it is only necessary that the accomplice’s testimony be uncorroborated.” Id. at 491 (¶ 17) (citation omitted).
¶ 34. “In determining whether a cautionary jury instruction is required, the testimony that must be corroborated is the testimony tying the defendant on trial to the crime, and it is irrelevant whether other portions of the accomplice’s testimony are corroborated.” Id. at (¶ 19). As explained by Williams, the jury must be instructed to view the testimony of a co-conspirator with great caution and suspicion in cases where the co-conspirator tes *995 timony is the sole basis for the conviction. Id. at 490 (¶ 12). In the case before us, however, the record reflects that Defendants’ convictions are supported by more evidence than just the testimony of Love, the co-conspirator. As previously noted, the State argues that Love’s testimony tying Defendants to the robbery was corroborated by other evidence admitted during trial. Specifically, the State points to Defendants’ phone records, the eyewitness testimony of Holt and Regina asserting that they saw a white Cadillac parked on a nearby road prior to the shooting, and the discovery of an unspent 9-millimeter round in James’s car after the shooting. Since the record provides evidence corroborating Love’s testimony, we find that the trial court was not required to instruct the jury to regard Love’s testimony with great caution and suspicion. See id. Therefore, this issue lacks merit.
III. Whether the trial court erred by refusing James’s jury instruction as to his theory of the case.
¶35. In the next assignment of error, James argues that the trial court erred by refusing his theory-of-the-case instruction, which told the jury that James’s “theory of the case is that at the time of the incident in question he was with Keshia Windom[,] and if you so find[,] you must find ... James not guilty.” Instead of giving this instruction, the trial court gave James’s alibi instruction. James argues, however, that he was entitled to both instructions and that his theory-of-the-case instruction correctly stated the law and was not fairly covered elsewhere in the jury instructions. James further contends that his refused instruction had a foundation in the evidence presented at trial since Windom testified that James was with her and the couple’s son at the time of the robbery. In response, the State argues that jury instruction 7 fully covered James’s theory of the case and, therefore, the trial court did not err.
¶ 36. As previously noted, this Court will not reverse the trial court’s refusal of a requested instruction where the jury was fairly, fully, and accurately instructed as to the applicable law. See Holmes, 754 So.2d at 537 (¶¶ 20-21) (citation omitted). Reading all the given jury instructions together, we find that jury instruction 7 adequately covered James’s theory of his case.[2] Because James’s proposed theory-of-the-case instruction was redundant, the trial court did not err by refusing it.[3] Therefore, this issue lacks merit.
IV. Whether the trial court’s form of the verdict was erroneously worded.
¶37. Roberson next argues that the verdict form provided to the jury was erroneously worded. In Thames v. State, 5 So.3d 1178, 1189 (¶ 35) (Miss.Ct.App. 2009), this Court stated:
Where there has been substantial compliance with the law, a jury’s verdict will not be reversed for mere want of form. Case law instructs that if the jury’s intent can be understood in a reasonably clear manner, there has been substantial compliance and there is no error. The basic test with reference to whether or not a verdict is sufficient as to form is *996 whether or not it is an intelligent answer to the issues submitted to the jury and expressed so that the intent of the jury can be understood by the court.
(Internal citations and quotation marks omitted).
¶ 38. In the present case, the form of the verdict provided the following options for each of the five counts charged in Defendants’ indictment:
We, the [j]ury, find the [Defendant, ..., guilty of [the corresponding crime charged in the indictment].
We, the [j]ury, find the [D]efendant, ..., not guilty of [the corresponding crime charged in the indictment].
To the left of each option, a place was provided where the jury could mark its decision as to the count charged. The jury found both James and Roberson guilty on all five counts.
¶ 39. In his brief, Roberson provides a one-sentence explanation to support his argument that the form of the verdict was erroneously worded. He merely states that “the trial court’s use of a verdict form ... that consistently placed the wording of finding the [Defendant guilty of each charge first, rather than wording that stated if the [Djefendant was to be found not guilty, created undue influence on the jury’s deliberations.”
¶40. We find that the form of the verdict constituted an “intelligent answer to the issues submitted to the jury” and allowed the “jury’s intent [to] be understood in a reasonably clear manner.” Id. Therefore, this issue lacks merit.
V. Whether juror misconduct denied Defendants a fair and impartial trial.
¶ 41. In their fifth assignment of error, Defendants argue that they failed to receive a fair and impartial trial due to juror misconduct. Defendants’ allegations of juror misconduct consist of the following actions: (1) a juror’s inappropriate eye contact during the trial with relatives of Jessie, the deceased victim; and (2) the failure of several jurors to disclose during voir dire a relationship with members of the victim’s family.
¶ 42. At the close of the State’s case and outside the jury’s presence, Defendants brought incidences of alleged juror misconduct to the trial court’s attention. Roberson’s mother (Mrs. Roberson) testified that she saw witnesses make eye contact with the Hill family and with the jurors while on the witness stand. She stated that she also saw members of the Hill family make eye contact with the State’s attorney, the witnesses, and the jurors. When the State’s attorney questioned Mrs. Roberson, she testified that she also saw him make eye contact with the witnesses on the witness stand. When asked by the State’s attorney what he was supposed to do and why she thought there was something wrong with “everybody looking at each other,” Mrs. Roberson replied, “Oh, I don’t know. I don’t know what’s the problem. I really don’t.”
¶43. In addition to Mrs. Roberson’s testimony, Defendants also questioned James’s brother, who testified that he saw a juror shaking her head and looking in the direction of where the Hill family sat as she walked to and from the jury box. Following this testimony, the State’s attorney noted the courtroom’s layout for the record:
The jury door actually faces toward the audience. And ... when they [ (the jurors) ] come out of the ... jury room, ... they face directly into the audience. And then the jury box is right here to their left, where they have to navigate upstairs. And there [are] two rows, and they have to go between the chairs to get to their seats while walking toward the — what they are claiming is where *997 the Hill family was sitting, that you had to walk in that direction.
Defendants then moved to have the juror who shook her head and looked in the direction of the Hill family removed from the jury and replaced with an alternate, but the trial judge overruled the request, finding that no evidence of juror misconduct existed.
¶ 44. Defendants’ final argument regarding juror misconduct rests upon their allegation that several jurors failed to disclose during voir dire a relationship with members of the victim’s family. In Roberson’s brief, he specifically stated that the “juror in question!] in this case is Hattie Mae McLaurin.” The record reflects that during voir dire McLaurin was referred to as Juror 23. During voir dire the State asked the following question: “The next persons I am going to ask about are the Hill family. We have Ricky Hill, Jimmy Hill, Jessie Earl Hill. Does anybody know the Hill family or [is anybody] friends with the Hill family?” McLaurin responded that she was a friend of the Hill family but stated that there was nothing about the relationship that would cause her to be unfair or partial. The record reflects that Defendants failed to challenge McLaurin when she was tendered by the State during voir dire.[4] At the hearing on Defendants’ motion for a JNOV or, in the alternative, a new trial, the trial judge noted that Defendants failed to ask any follow-up questions regarding McLaurin’s statement. The trial judge further stated that, “in relation to whether [McLaurin] responded to the questions on voir dire or gave you knowledge of her relationship to the Hill family, she has already done that.” As a result, the trial judge refused to let Defendants call McLaurin as a witness at the hearing.
¶ 45. In their remaining allegations of juror misconduct, Defendants reference other jurors who they claim failed to disclose a relationship with members of the Hill family. When the State asked during voir dire whether any of the potential jurors knew the Hill family or were friends with the Hill family, none of these jurors acknowledged a relationship with the Hill family. At the hearing the trial judge stated that Defendants’ attorneys could call the jurors they subpoenaed, but he limited the questioning to whether or not those jurors responded to questions that were asked of them during voir dire, and he refused to allow questions about the jurors’ deliberations. When questioned during the hearing, all of these jurors testified that they only knew of the Hill family but did not personally know a member of the family. Each juror also testified that he or she thought the question asked during voir dire was intended to find out which potential jurors personally knew the Hill family or had an actual relationship with the family.
¶ 46. One juror, Jeanell Jamison (Jami-son), testified that she worked at the same elementary school as the victim’s sister and one of the victim’s daughters. However, Jamison and the victim’s sister and daughter testified that they rarely, if ever, had any contact with each other since Ja-mison worked in the school’s cafeteria and the victim’s sister and daughter worked as teachers. Jamison testified that the teachers did not usually accompany their students into the cafeteria for lunch because that job belonged to their assistants.
¶ 47. Another juror, Barnes, testified that at some point she and two of the victim’s daughters had worked at the same Wal-Mart. However, Barnes testified at *998 the hearing that she did not converse with members of the Hill family and did not know any of them personally. James Hughes and Betty Weatherby, two other jurors called by Defendants’ attorneys, also testified that they knew of the Hill family but did not know any of the family members personally.
¶ 48. Case law provides that if a potential juror fails to answer a question asked during voir dire, then the trial court should determine whether the question asked was “(1) relevant to the voir dire examination; (2) whether it was unambiguous; and (3) whether the juror had substantial knowledge of the information sought to be elicited.” Odom v. State, 355 So.2d 1381, 1383 (Miss.1978). If the answers to these three questions are affirmative, then the trial court should determine if prejudice to the defendant could be inferred due to the juror’s failure to respond. Id. Where prejudice can be reasonably inferred, the trial court should order a new trial. Id. “It is, of course, a judicial question as to whether a jury is fair and impar-tíale,] and the [trial] court’s judgment will not be disturbed unless it appears clearly that it is wrong.” Id.
¶ 49. The question posed during voir dire in this case was ambiguous, and as evidenced by their testimony, none of the jurors questioned during the hearing possessed “substantial knowledge of the information sought to be elicited.” Id. As previously discussed, all four jurors who testified during the hearing stated that they believed the voir dire question was intended to discover who might personally know the Hill family or have an actual relationship with the family. Furthermore, as each of the jurors stated, they did not personally know a member of the Hill family but merely knew of the Hill family.
Therefore, after reviewing the evidence in the record, we find that this assignment of error lacks merit.[5]
CONCLUSION
¶ 50. Accordingly, we affirm the trial court’s judgment.
¶ 51. JAMES: THE JUDGMENT OF THE ATTALA COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I, ARMED ROBBERY; COUNT II, MANSLAUGHTER; COUNTS III AND IV, AGGRAVATED ASSAULT; AND COUNT V, CONSPIRACY TO COMMIT ARMED ROBBERY; AND SENTENCES OF TWENTY YEARS EACH ON COUNTS I, II, III, AND IV, AND FIVE YEARS ON COUNT V; WITH THE SENTENCE IN COUNT I TO RUN CONSECUTIVELY TO THE SENTENCES IN COUNTS II, III, AND IV; WITH THE SENTENCE IN COUNT III TO RUN CONCURRENTLY WITH THE SENTENCE IN COUNT II; WITH THE SENTENCE IN COUNT IV TO RUN CONSECUTIVELY TO THE SENTENCES IN COUNTS II AND III; AND WITH THE SENTENCE IN COUNT V TO RUN CONCURRENTLY WITH THE SENTENCES IN COUNTS I, II, III, AND IV; ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS; IS AFFIRMED. ROBERSON: THE JUDGMENT OF THE ATTALA COUNTY CIRCUIT COURT OF CONVICTION OF COUNT I, ARMED ROBBERY; COUNT II, MANSLAUGHTER; COUNTS III AND IV, AGGRAVATED ASSAULT; AND COUNT V, CONSPIRACY TO COMMIT ARMED ROBBERY; AND SENTENCES OF TWENTY YEARS EACH ON COUNTS I, II, III, AND IV, AND FIVE YEARS ON COUNT V; WITH *999 THE SENTENCE IN COUNT I TO RUN CONSECUTIVELY TO THE SENTENCES IN COUNTS II, III, AND IV; WITH THE SENTENCE IN COUNT III TO RUN CONSECUTIVELY TO THE SENTENCE IN COUNT II; WITH THE SENTENCE IN COUNT IV TO RUN CONCURRENTLY WITH THE SENTENCES IN COUNTS II AND III; AND WITH THE SENTENCE IN COUNT V TO RUN CONCURRENTLY WITH THE SENTENCES IN COUNTS I, II, III, AND IV; ALL IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS; IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLANTS.
LEE, C.J., IRVING AND GRIFFIS, P.JJ., BARNES, ISHEE, ROBERTS AND FAIR, JJ„ CONCUR. MAXWELL, J., CONCURS IN PART AND IN THE RESULT WITHOUT SEPARATE WRITTEN OPINION. JAMES, J., CONCURS IN PART WITHOUT SEPARATE WRITTEN OPINION.

. Defendants' motions refer to a juror named Hattie Mae Lewis, but in his order denying Defendants' motions, the trial judge noted that "no one named Hattie Mae Lewis served on the jury, but ... a lady named Hattie McLaurin did."

. See Bolden v. State, 23 So.3d 491, 500 (¶ 29) (Miss.Ct.App.2009) ("[J]ury instructions should be taken as a whole with all jury instructions being read together and not taking a single instruction out of context.”) (citation omitted).

. See Newell v. State, 49 So.3d 66, 73 (¶ 20) (Miss.2010) ("It is well settled that jury instructions generally are within the discretion of the trial court, so the standard of review for the [refusal] of jury instructions is abuse of discretion.”) (citation omitted).

. Defendants' attorneys raised no peremptory challenges or challenges for cause as to McLaurin.

. See Burton v. State, 875 So.2d 1120, 1122 (¶ 6) (Miss.Ct.App.2004) (“The standard of review in examining the conduct of voir dire ... is abuse of discretion.”) (citations omitted).