MYERS, P.J.,
for the Court:
¶ 1. Tyshunna Cooper Ross was indicted on one count of gratification of lust and one count of sexual battery by a Madison County grand jury. The indictments stemmed from the thirty-seven-year-old Ross’s relationship with a twelve-year-old boy, A.B.[1] The State alleged that on July 4, 2007, Ross committed sexual battery by having sexual intercourse with A.B. and that she had touched his penis for the purpose of gratifying her lust.
¶ 2. Ross was subsequently convicted on both counts in the Circuit Court of Madison County. The trial court sentenced Ross to fifteen years on the gratification of lust count and forty years on the sexual battery count, with the sentences to be served consecutively. The sentencing order provided that the final thirty-seven years of the sentence would be suspended, with five years’ supervised probation. Ross was also ordered to register as a sex offender. Aggrieved by her conviction and *979 sentence, Ross appeals, arguing that: the jury’s verdict is against the overwhelming weight of the evidence; the evidence was insufficient to support the convictions; and she received constitutionally ineffective assistance of counsel at trial. Finding no error, we affirm Ross’s convictions and sentences.
FACTS
¶ 3. At trial, A.B., then fourteen years of age, testified for the State. A.B. stated that he knew Ross through her daughter, who A.B. had “dated” for some period of time in the sixth grade.[2] Some time later, Ross had bought beer for A.B. and his friends on two separate occasions. Then, on July 3, 2007, Ross invited A.B. and two of his friends, both fourteen years old, to “hang out” with her at the home she shared with a roommate. Ross’s home was located approximately one quarter mile from A.B.’s. Ross told the boys that she was locked out, so they sat out on the carport. Ross smoked cigarettes and drank vodka, both of which she shared with the boys. A.B. consumed four or five “shots” of vodka. At Ross’s request, the party then went into the nearby woods, where they continued to smoke and drink. A.B. testified that while in the woods, he and Ross kissed and he fondled Ross’s breasts. When it started to get dark, C.D., one of A.B.’s friends, sneaked Ross into his bedroom through an outside window. Ross stayed with C.D. for an hour or so before calling her boyfriend, Tom Carter, who picked Ross up from C.D.’s house. Later that evening, A.B., C.D., and two girls aged twelve or thirteen sneaked into A.B.’s bedroom, where they “talked and kissed” for about forty-five minutes before A.B.’s mother abruptly entered the bedroom at approximately 11:00 p.m. and took the other children home.
¶ 4. The next day, July 4, 2007, A.B.’s parents were hosting a party at their home. Ross and A.B. made contact around noon, either by telephone or text message. Later that day, Ross told A.B. that her boyfriend had beaten her and that she needed a place to stay. A.B. offered to let Ross stay with him. She arrived a short time later, at approximately 8:30 p.m., and A.B. helped her sneak into the home through a laundry room window. A.B. and Ross went to A.B.’s bedroom, and A.B. locked the bedroom door. Ross asked for a drink, and A.B. gave her a beer from a case he had taken from his parents’ party and hidden in a gun cabinet in his bedroom.
¶ 5. A.B. recounted what happened next as follows:
Q. And once y’all are in your room and she was drinking beer, what happened then?
A. We sat on the floor and talked a little bit. I don’t — I don’t specifically remember what we talked about, but I know we’re — we were about to go to sleep and then we started kissing and touching and stuff.
Q. Okay. And where was she touching you?
A. All over me.
Okay. <D
Including my penis. >
On top of your clothes or beneath your clothes? eO
Beneath, ma’am. >
Q. Under your underwear or on top of your underwear?
A. Under my underwear.
Q. And what — what happened after that?
*980 A. Well, one thing lead to another. Basically, the inti — the intimacy grew and we — there was a condom sitting on my nightstand, I guess would say—
Q. And what was that doing there and how did it get there?
A. Well, I — I had gotten it from a guy that I didn’t even know. He just gave it to me and—
Q. When? How long had you had it?
A. Two or three weeks maybe.
Q. Okay.
A. And it was just sitting there because I didn’t know — well, I just had it sitting out. And from then on I kind of — I grabbed it and I held it up and she looked at it and she' kind of nodded yes and there— there wasn’t really verbal, it was more nodding and shaking of the head.
And so I went to the bathroom and put that on. And when I came back she was sitting on my bed, and my bed at that the time squeaked really bad so I was like, you know, you can’t do it on the bed. It squeaked really bad, so we proceeded on the floor and she laid down—
Q. Did she have her clothes on or off at that time?
A. She had a shirt on and she had her scrubs on and she pulled those down about to her knees or ankles.
Q. Were your clothes on or off?
A. I pulled my pajama bottoms down to my knees.
Q. And then what happened?
A. And then we proceeded to have sexual intercourse.
Q. On the floor?
A. Yes, ma’am.
Q. And were you on top or bottom or—
A. I was on top.
Q. Okay. And what, if anything, was she saying to you at this time?
A. She just kept repeating “F me,” “F me” in my ear.
Q. And how long do you think that lasted?
A. Ten, [fifteen] minutes, maybe.
Q. And then at — what—did you ejaculate at that time?
A. Yes, ma’am.
Q. And you had a condom on?
A. Yes, ma’am.
Q. Okay. What did you do at that point?
A. I went to the bathroom and tried to flush it down the toilet and it didn’t go down. It came right back up and I grabbed it and put it in the trash can.
Q. All right. And then what did you do?
A. I went — I was about to go to bed. I laid [sic] down and I was just about to doze off and I see the door open and the light flicker on, and it was my mom and Tyshunna through [sic] the cover over her head and just her ham was hanging out.
Q. Okay. And after your mom came in what did you do?
A. My mom called — called me out and she, like, “What are you doing?” Because the night before I had two friends of mine, girls and guys, that were in my room, and so she — she thought it was a girl my age because just her hair was showing. And so I proceeded to say, “Mom, you don’t really understand.” We went downstairs and she said, like, “I can’t believe you did this again.”
A.B. then went downstairs with his mother, but Ross initially stayed in the bed *981 room. A.B. testified that after he explained to his mother who he had been with, he denied that anything sexual had occurred.
¶ 6. A.B.’s mother testified that she had heard a noise coming from A.B.’s room, and that after the events of the previous night, she decided to investigate. She noticed that A.B.’s door was closed and locked, but she was able to open the door with a toothpick. When she turned on the lights, A.B.’s mother saw A.B. and a woman in the bed. The woman covered her face with the sheets, but A.B.’s mother observed that the woman was wearing scrubs and was not the same girl A.B. had been with the previous night. A.B.’s mother and A.B. went downstairs, where A.B. told his mother that she “didn’t understand” and that the woman “had no place to go.” After his mother — believing at this time that the woman was a teenager — expressed doubts, A.B. averred that the woman had been beaten by her boyfriend and had been “kicked out.” A.B. then called for Ross to come downstairs. A.B.’s mother recognized Ross and stated, “I can’t believe it’s you.” Ross then apologized and averred that she had been locked out by her roommate, who was out on a date, and had no place to go. Ross stated that she had no one she could call to come and get her, but she would try to contact her roommate. A.B.’s mother described Ross as acting “like she was kind of in a trance” and stated that Ross “really didn’t say much” and “didn’t act like an adult.” A.B.’s mother offered Ross the guest bedroom for the night, and she brought A.B. to sleep in his parents’ bedroom. At approximately 2:00 a.m., Ross made contact with her roommate, who came and picked Ross up.
¶ 7. A.B. initially denied that anything of a sexual nature had occurred between him and Ross. On July 5, he and his family traveled to Chattanooga, Tennessee, to stay with his aunt and uncle. They returned to Madison the following Sunday. On Monday, A.B.’s mother was contacted by a friend who told her that Ross had given their sons alcohol on July 3. A.B.’s mother took A.B. to the Madison Police Department to give a statement regarding the events of that day. During the interview, A.B. told the investigating officer that after drinking the vodka on July 3, he and C.D. had kissed Ross and fondled her breasts. A.B. also stated that on July 4, while he was in bed with Ross, she had touched his penis and he had fondled her breasts; however, A.B. denied that the two had sexual intercourse. A.B. was then sent for an interview at a Child Advocacy Center (CAC), which was conducted on July 12. At the CAC interview, A.B. again did not disclose the sexual intercourse. On July 13, however, A.B. told his mother the “full truth.” She then brought A.B. back to the Madison Police Department for a second interview, where he recounted substantially the same facts that he testified to at trial. An audio recording of the second police interview was introduced into evidence and played for the jury.
¶ 8. Detective Mike Magee of the Madison Police Department also testified for the State. He stated that he had interviewed Ross after her arrest. Ross had admitted that she had provided A.B. and the other boys with beer and vodka, as well as having been present in A.B.’s bedroom on the night of July 4. She stated that this was because she had been locked out by her roommate and was hiding from her abusive boyfriend. Ross had denied that any sexual contact had occurred with A.B. on either July 3 or July 4. Ross stated, instead, that she had fallen asleep in A.B.’s bed after drinking the beer A.B. had given her. Ross’s version of the events was, apparently, that A.B. had gotten into the bed with her while she was *982 asleep and that no sexual contact had occurred.
¶ 9. Martin McRae also testified for the State. McRae stated that he had known Ross since 1995. McRae had picked Ross up from her roommate’s house on July 4, and he had taken Ross to a fireworks display that evening. McRae had intended to return Ross to the roommate’s home; however, Ross asked to be taken to what she claimed was the home of a woman she knew. McRae then dropped Ross off near A.B.’s home. McRae also testified that he had helped Ross out in the past and had let her stay with him, but she did not tell him that she had no place to go on the night of July 4.
¶ 10. After the State rested its case, Ross did not testify and offered no witnesses in her defense. Ross was subsequently convicted and sentenced on both counts, and she appeals from that judgment.
DISCUSSION
¶ 11. Ross argues in her first issue on appeal that the jury’s verdict is against the overwhelming weight of the evidence and was legally insufficient to support the conviction. See Bush v. State, 895 So.2d 836, 843-44 (¶¶ 16,18) (Miss.2005). In her final issue, she argues that she received ineffective assistance of counsel at trial.
1. Weight of the Evidence
¶ 12. “The jury is charged with the responsibility of weighing and considering conflicting evidence, evaluating the credibility of witnesses, and determining whose testimony should be believed.” Smith v. State, 3 So.3d 815, 818 (¶ 13) (Miss.Ct.App.2009) (quoting Ford v. State, 737 So.2d 424, 425 (¶ 8) (Miss.Ct.App.1999)). The supreme court has discussed appellate review of the weight of the evidence supporting a jury’s verdict, stating:
When reviewing a denial of a motion for a new trial based on an objection to the weight of the evidence, we will only disturb a verdict when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice.... However, the evidence should be weighed in the light most favorable to the verdict. A reversal on the grounds that the verdict was against the overwhelming weight of the evidence, unlike a reversal based on insufficient evidence, does not mean that acquittal was the only proper verdict. Rather, as the “thirteenth juror,” the court simply disagrees with the jury’s resolution of the conflicting testimony. This difference of opinion does not signify acquittal any more than a disagreement among the jurors themselves. Instead, the proper remedy is to grant a new trial.
Bush, 895 So.2d at 844 (¶ 18) (internal citations and quotations omitted). The court has cautioned, however, that a challenge to the weight of the evidence “is addressed to the discretion of the court, which should be exercised with caution, and the power to grant a new trial should be invoked only in exceptional cases in which the evidence preponderates heavily against the verdict.” Id. (quoting Amiker v. Drugs For Less, Inc., 796 So.2d 942, 947 (¶ 18) (Miss.2000)).
¶ 13. Ross argues that the jury’s verdict is against the overwhelming weight of the evidence because of A.B.’s initial denials, his staggered disclosure of the sexual contact with Ross over several interviews, and certain inconsistencies in his testimony. Ross also argues that certain facts suggest innocence, particularly that two condom wrappers were found in A.B.’s room, of which he only identified one as “his.” She further argues that A.B.’s de *983 scription of the physical act of intercourse was physically impossible or improbable.
¶ 14. Regarding A.B.’s initial denials, we have previously noted that “[i]t is common for a victim of sexual abuse to be embarrassed and to initially deny that the crimes occurred.” Smith v. State, 907 So.2d 389, 395 (¶17) (Miss.Ct.App.2005). A.B. testified that he initially denied sexual contact with Ross because he was afraid of what would happen and that he feared he would “get in trouble.” He also testified that Ross had called him on the day after the two were discovered and warned him that if he disclosed the sexual contact, she would be prosecuted and imprisoned. A.B. also stated that during the initial police and CAC interviews, he was embarrassed by the events and felt uncomfortable with the interviewers. Other than the initial denials, the inconsistencies or apparent contradictions in A.B.’s account cited by Ross are relatively minor and of little import.[3] The foremost is A.B.’s initial statement to authorities that both he and another boy, C.D., had kissed Ross and fondled her breasts in the woods on July 3. A.B. subsequently recanted this statement and stated that only he had sexual contact with Ross on July 4; A.B. testified that he had feared that if he had been the only victim, he would be blamed for what had happened. We note, also, that A.B. was intoxicated during the events of July 3. Moreover, although the other boy apparently denied any sexual contact with Ross, he was older than A.B. and had sneaked Ross into his own bedroom on July 3, after the group left the woods.
¶ 15. Ross also argues that evidence at trial pointed to her innocence. In particular, she cites her unsworn statement from the police interview, where she denied any sexual contact. Ross also cites to the fact that two condom wrappers were recovered from AB.’s garbage. According to his mother’s testimony, A.B. had identified one of the condom wrappers as “his,” the wrapper from the condom he used while having sexual intercourse with Ross. The provenance of the second condom wrapper was never explained at trial; A.B. was not questioned regarding it, and his mother testified that A.B. had not told her where it had come from or who it had belonged to. Ross argues that the presence of two condom packages suggest that the condoms were used together on July 3, when A.B. and C.D. had two girls in the bedroom.
¶ 16. After reviewing the facts and arguments as we have detailed them above, we find these arguments without merit. We find little evidence weighing against the verdict; Ross did not testify and her arguments regarding the condom wrappers rely upon supposition and possibilities. Moreover, Ross’s statement failed to sufficiently explain many of her actions and was contradicted by the testimony of the State’s witnesses, whereas A.B.’s testimony was corroborated by the circumstances in which the two were discovered. Furthermore, Ross admitted to giving A.B. alcohol, to sneaking into his bedroom, and to being in bed with A.B. when the two were found together. With little evidence weighing against conviction, the verdict in this case hinged on the credibility of the *984 State’s witnesses, particularly A.B. and his mother. “The jury is the sole judge of the weight of the evidence and the credibility of the witnesses.” Nix v. State, 8 So.3d 141, 146 (¶ 26) (Miss.2009) (quoting Mohr v. State, 584 So.2d 426, 431 (Miss.1991)). We note also that at trial Ross brought all of the significant credibility issues we have discussed above to the attention of the jury, but the jury nonetheless found A.B.’s testimony credible. A.B.’s testimony was not inherently implausible, nor was it so seriously impeached that no reasonable juror could find it credible. We therefore find that the jury’s verdict is not against the overwhelming weight of the evidence. This issue is without merit.
2. Sufficiency of the Evidence
¶ 17. The supreme court has stated that “the critical inquiry is whether the evidence shows ‘beyond a reasonable doubt that [the] accused committed the act charged, and that he did so under such circumstances that every element of the offense existed; and where the evidence fails to meet this test it is insufficient to support a conviction.’ ” Bush, 895 So.2d at 843 (¶ 16) (quoting Carr v. State, 208 So.2d 886, 889 (Miss.1968)). The supreme court cautioned, however, that:
this inquiry does not require a court to “ ‘ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt.’ Instead, the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.”
Id. (quoting Jackson v. Virginia, 443 U.S. 307, 315, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979)). The supreme court continued:
Should the facts and inferences considered in a challenge to the sufficiency of the evidence “point in favor of the defendant on any element of the offense with sufficient force that reasonable men could not have found beyond a reasonable doubt that the defendant was guilty,” the proper remedy is for the appellate court to reverse and render. However, if a review of the evidence reveals that it is of such quality and weight that, “having in mind the beyond a reasonable doubt burden of proof standard, reasonable fair-minded men in the exercise of impartial judgment might reach different conclusions on every element of the offense,” the evidence will be deemed to have been sufficient.
Id. (internal citations omitted).
¶ 18. The supreme court has recently stated:
An individual may be found guilty of rape on the uncorroborated testimony of the prosecuting witness, where the testimony is not discredited or contradicted by other credible evidence. See Withers v. State, 907 So.2d 342, 353 [(¶32)] (Miss.2005) (persons accused of statutory rape “may be found guilty on the uncorroborated testimony of a single witness.”) (citation omitted); Killingsworth v. State, 374 So.2d 221, 223 (Miss.1979) (“while it is true that a conviction for rape may rest on the uncorroborated testimony of the person raped, that testimony should always be scrutinized with caution.”); Dubose v. State, 320 So.2d 773, 774 (Miss.1975) (“the testimony of the victim of a rape may be sufficient to support a guilty verdict where the victim’s testimony is neither contradicted nor discredited by other evidence or by surrounding circumstances.”); Blade v. State, 240 Miss. 183, 188, 126 So.2d 278, 280 (1961) (the testimony of the prosecutrix in a rape case “does not need corroboration.... ”).
*985 Parramore v. State, 5 So.3d 1074, 1077-78 (¶ 12) (Miss.2009).
¶ 19. We find that the evidence as we have discussed it above, viewed in a light most favorable to the prosecution, is sufficient to support the jury’s verdicts. A.B.’s testimony regarding the fondling and sexual intercourse was sufficiently credible, and it was corroborated by the circumstances in which he and Ross were discovered. This issue is without merit.
3. Ineffective Assistance of Counsel
¶ 20. “In order to prevail on the issue of whether his defense counsel’s performance was ineffective, [the appellant] must prove that his counsel’s performance was deficient and that he was prejudiced by counsel’s mistakes.” Kinney v. State, 737 So.2d 1038, 1041 (¶ 8) (Miss.Ct.App.1999) (citing Strickland v. Washington, 466 U.S. 668, 687-96, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984)). Additionally, an appellant is required to “allege both prongs of the above test with specific detail.” Coleman v. State, 979 So.2d 731, 735 (¶ 15) (Miss.Ct.App.2008) (citing Brooks v. State, 573 So.2d 1350, 1354 (Miss.1990)).
¶ 21. “The adequacy of counsel’s performance, as to its deficiency and prejudicial effect, should be measured by a ‘totality of the circumstances.’ ” Taylor v. State, 682 So.2d 359, 363 (Miss.1996). The test is to be applied to the overall performance of counsel. Bigner v. State, 822 So.2d 342, 346 (¶ 24) (Miss.Ct.App.2002). “There is a strong, yet rebuttable, presumption that the actions by the defense counsel were reasonable and strategic.” Taylor, 682 So.2d at 363.
¶ 22. Ross argues that her counsel at trial was ineffective, but she cites to few specific examples of alleged ineffectiveness. She notes that defense counsel made no pretrial motions or objections during the trial, called no witnesses, and offered no jury instructions. Yet, as we have said, the actions of trial counsel are presumed to be reasonable and strategic; the burden falls upon Ross to overcome this presumption. Id.
¶ 23. With one exception, Ross has failed to substantiate these arguments by stating what witnesses should have been called or what motions, objections, or instructions should have been made or offered and by showing how those failures impacted her trial. Ross’s only fully substantiated allegation of ineffective assistance of counsel concerns a bench conference and recess called by the trial court during her attorney’s cross-examination of A.B. The bench conference was held outside the hearing of the court reporter and was not transcribed in the record. Ross alleges that, during the bench conference, the trial judge sua sponte limited cross-examination of the victim on the subject of the condom wrapper. Ross argues that her attorney was ineffective in failing to object to the trial court’s instruction on the record or to proffer the relevant testimony. She further argues that, had the court not limited cross-examination, A.B. would have admitted that both condoms were used during “sexual activity” in his bedroom on July 3. The State argues in response that Ross’s allegations are unsupported in the record, and that record is entirely silent regarding the reason for the bench conference. The State concludes, instead, that considering the length of the cross-examination of A.B., “one may reasonably surmise that a call of nature occasioned [the recess].”
¶ 24. We agree. Ross’s argument is substantiated only by allegations in her brief. Nothing in the record suggests that the trial court limited cross-examination or that A.B. would have testified that the condoms were used during “sexual activity” on July 3. In fact, although Ross *986 repeatedly alleges that “sexual activity” occurred between the children in A.B.’s bedroom on night of July 3, this is also unsupported in the record. Instead, A.B. testified that, while in his bedroom, he, C.D., and the two girls had “talked and kissed. That was about it.” Moreover, had the trial court limited cross-examination during an off-the-record bench conference, as Ross alleges, she could have supplemented the record on appeal under Rule 10 of the Mississippi Rules of Appellate Procedure. Ross has not done so. Nothing in the record indicates that the trial court limited cross-examination or that trial counsel was ineffective in failing to make an objection or proffer. Nor does the record show that Ross was prejudiced by these errors of counsel, if they occurred. This issue is without merit.
¶ 25. THE JUDGMENT OF THE CIRCUIT COURT OF MADISON COUNTY OF CONVICTION OF COUNT I, GRATIFICATION OF LUST, AND SENTENCE OF FIFTEEN YEARS, AND COUNT II, SEXUAL BATTERY, AND SENTENCE OF FORTY YEARS, WITH THE SENTENCES TO RUN CONSECUTIVELY IN THE CUSTODY OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS, WITH THIRTY-SEVEN YEARS SUSPENDED AND FIVE YEARS’ SUPERVISED PROBATION, IS AFFIRMED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO MADISON COUNTY.
KING, C.J., LEE, P.J., IRVING, GRIFFIS, BARNES, ISHEE, ROBERTS AND MAXWELL, JJ., CONCUR. CARLTON, J., NOT PARTICIPATING.

. To protect the identity of minor victims of sexual abuse, we substitute fictitious initials for their names.

. Ross’s children apparently lived with their father most of the time.

. For example, Ross argues that A.B. was inconsistent regarding whether there was one other boy in the woods on July 3 or two, whether she or A.B. had physically manipulated A.B.’s penis into Ross’s vagina during the sexual act, and whether Ross had wiped herself with a towel or whether A.B. had wiped his hands with it after touching her. She also argues that A.B.’s testimony that both he and Ross had pulled their pants to the knees during the sexual act, as it was described, was improbable or physically impossible.