# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2022-KA-00438-COA

ROBERT ALEXANDER KEYS A/K/A ROBERT A. KEYS A/K/A DOUGH BOY                    APPELLANT

v.

STATE OF MISSISSIPPI                                                          APPELLEE

DATE OF JUDGMENT:                04/28/2022
TRIAL JUDGE:                     HON. PRENTISS GREENE HARRELL
COURT FROM WHICH APPEALED:       LAMAR COUNTY CIRCUIT COURT
ATTORNEY FOR APPELLANT:          OFFICE OF STATE PUBLIC DEFENDER
                                 BY: HUNTER NOLAN AIKENS
ATTORNEY FOR APPELLEE:           OFFICE OF THE ATTORNEY GENERAL
                                 BY: BARBARA WAKELAND BYRD
DISTRICT ATTORNEY:               HALDON J. KITTRELL
NATURE OF THE CASE:              CRIMINAL - FELONY
DISPOSITION:                     AFFIRMED - 10/24/2023
MOTION FOR REHEARING FILED:

**BEFORE WILSON, P.J., McDONALD AND LAWRENCE, JJ.**

**McDONALD, J., FOR THE COURT:**

¶1.     Robert Keys appeals his jury conviction of statutory rape on the ground that the trial court abused its discretion by refusing to instruct the jury on prior inconsistent statements and impeachment testimony.[1] Keys also argues that the verdict was against the overwhelming

---

[1] Mississippi Code Annotated section 97-3-65 defines statutory rape:

(1) The crime of statutory rape is committed when:

    (a) Any person seventeen (17) years of age or older has sexual intercourse with a child who:

        (i) Is at least fourteen (14) but under sixteen (16) years of age;

        (ii) Is thirty-six (36) or more months younger than the person; and

        (iii) Is not the person's spouse; or

weight of the evidence. For the reasons discussed below, we affirm the conviction and sentence.

## FACTS AND PROCEDURAL HISTORY

¶2. On January 14, 2018, Kim[2] was thirteen years old. After a fight with her parents, Kim ran away from her home near Bassfield in Jefferson Davis County. Kim's parents reported her missing to the Bassfield Police Department. Jennifer Meredith, the assistant chief of the Bassfield Fire Department and a close family friend,[3] received word that Kim was missing and immediately searched the community. Meredith eventually received word that Kim had been dropped off at a friend's house in the Sumrall area in the neighboring Lamar County. Meredith reported to George Keys,[4] a police officer with the Sumrall Police Department,

---

> (b) A person of any age has sexual intercourse with a child who:
> > (i) Is under the age of fourteen (14) years; and
> > (ii) Is twenty-four (24) or more months younger than the person.
> (2) Neither the victim's consent nor the victim's lack of chastity is a defense to a charge of statutory rape.
> . . . .
> (7) For the purposes of this section, "sexual intercourse" shall mean a joining of the sexual organs of a male and female human being in which the penis of the male is inserted into the vagina of the female or the penetration of the sexual organs of a male or female human being in which the penis or an object is inserted into the genitals, anus or perineum of a male or female.

[2] The victim was a minor under the age of fourteen years at the time of the assault. As such, she is referred to as "Kim."

[3] Meredith worked with Kim's father, who was the chief of the Bassfield Fire Department.

[4] George Keys is not related to the appellant.

2

where Kim had been dropped off, and they both went to find her. Upon finding her at her friend's house, Officer Keys and Meredith took Kim to the police station, where Meredith tried to comfort Kim and keep her calm until her parents arrived. While at the police station, Kim made statements that she had been sexually assaulted. Later, based on these statements and others, a Lamar County grand jury indicted both Forest Shoemake and Robert Keys for statutory rape.

¶3. The trial date was finally set, after various continuances, for April 26, 2022. Aside from the continuances and a motion in limine Keys filed regarding a polygraph test that Forest Shoemake took, no other motions or orders were entered prior to trial. After a jury was empaneled and opening statements were made, the State called its witnesses. Below are summations of each key witness's testimony and the jury instructions.

*Kim's Testimony*

¶4. At trial, Kim testified that she had run away from home after a fight with her parents on January 14, 2018, the day before she turned fourteen. Kim left home between 2:30 and 3:00 in the morning. After running away, Kim decided to go to Sumrall to a friend's house. She realized she was cold and quite far from Sumrall, so she decided to turn around and go back home. As she was going home, a car pulled up beside her with Keys and another person inside. Keys asked if she needed a ride, and Kim asked him to take her to Bassfield or Sumrall. When she got in the car, Keys asked how old she was, and Kim told him she was thirteen. Instead of taking Kim home or to her friend's house in Sumrall, Keys took her to

3

his apartment. After arriving at his apartment, Forest Shoemake and his girlfriend Charikee Prosser arrived. Keys said that they were going to have an "ice party." Kim testified that she did not know what that meant at the time, but later she understood that it meant they were going to smoke meth. While at the apartment, the four of them, including Kim, proceeded to smoke meth and marijuana and snort a "white powder." Afterward, Shoemake mentioned to Kim that Keys had invited him over to have sex with her. When Shoemake asked to have sex with her, she refused. Shoemake then offered her more drugs. After Kim took more of the drugs, Shoemake proceeded to take her clothes off and have sex with her while Keys and Prosser were in the room. Kim testified that Prosser and Keys also started having sex with each other, but eventually they "swapped out": Shoemake started having sex with Prosser, while Keys started having sex with Kim. Specifically, Kim testified that Keys penetrated her vagina with his penis.

¶5.     After having sex, Shoemake and Prosser said they were going to leave, and they offered to take Kim to her friend's house in Sumrall. Instead of going to her friend's house, however, Shoemake and Prosser took Kim to Brittany's house, who was the mother of Shoemake's child, where Shoemake proceeded to take a shower with Kim. Afterward, Prosser and Shoemake took Kim to her friend's house in Sumrall. Kim's friend alerted the police, and Kim was later picked up by Meredith and Officer Keys.

¶6.     Kim then testified that she did not remember most of the details of her disclosures to the police or to the hospital staff during her sexual-assault exam. On cross-examination, she

4

stated that while she did not remember the details of her disclosures to the hospital staff or the police officers, she confirmed that based on the records of the hospital and the videotape of her statement to the police, she never mentioned Keys sexually assaulting her. On redirect, however, Kim stated that her father's friend[5] was in the room when she gave her first statement, and she did not mention Keys to officers at the Sumrall Police Department because she was afraid he would tell her father.

*Police Chief Elsie Cowart's Testimony*

¶7. Kim's medical records and sexual assault kit were admitted through Sumrall Police Chief Cowart's testimony. Based on the forensic lab's report, Chief Cowart testified that Shoemake's DNA was found during Kim's sexual assault exam, but Keys's was not. Chief Cowart testified that, in her experience, recovering no DNA evidence in a sexual assault case was not uncommon. On cross-examination, Chief Cowart was questioned about Kim's disclosure at the hospital. According to the hospital records, Kim twice denied any oral or anal penetration, but did disclose that she had endured "vaginal penetration with penis only without use of a condom or other barrier of protection." Kim also disclosed that she believed the person who assaulted her was around twenty-six years old. Cowart agreed that this corresponded closer to Shoemake's age rather than Keys, who was thirty-five. Throughout Kim's disclosure to hospital personnel, she primarily referred to Shoemake as the "assailant."

---

[5] One of the police officers in the room was a friend of Kim's father, who, as previously mentioned, was the fire chief for Bassfield Fire Department.

Cowart testified on redirect that during Kim's hospital disclosures, Kim's mother was present. Cowart stated that in her experience, many child victims are embarrassed when discussing specific details of sexual abuse in front of their parents, and it is not uncommon for child victims to not disclose every detail at first.

*Emily Dixon's Testimony*

¶8. A few days after the exam, Kim went to Hattiesburg for a forensic interview with the Child Advocacy Center. There, Kim made consistent statements regarding a sexual assault. Emily Dixon with the Child Advocacy Center testified as an expert witness in forensic interviewing. During direct examination, Dixon was asked whether it was common for children not to tell the full story regarding a sexual assault, and she testified that it was not uncommon. After presenting the full forensic interview to the jury, on cross-examination Dixon was asked whether Kim ever stated that she and Keys had sex. Dixon confirmed that during the forensic interview Kim never said that she and Keys had sex.

*Forest Shoemake's Testimony*

¶9. Forest Shoemake also testified at trial. Shoemake knew Keys as his drug dealer. He also pled guilty to the statutory rape of Kim. He stated that he did not know Kim's age at the time of the rape, but once he found out, he "came clean" because he knew it was wrong. Shoemake also testified that he signed a plea agreement with the State that required him to fully cooperate and truthfully furnish complete and detailed information regarding his involvement in the crimes of his co-defendant, referring to Robert Keys. Shoemake said that

6

on the night in question, his girlfriend at the time (Prosser) had mentioned wanting to see him with another woman, and Shoemake had asked Keys if he knew of a woman he could set him up with. Keys said that he did and invited Shoemake and Prosser over.

¶10.  Once there, Shoemake purchased methamphetamine from Keys and met Kim, who Shoemake assumed was the girl Keys had mentioned setting him up with. They all snorted and smoked meth. Shoemake then asked Keys about the girl, and Keys indicated that Kim was the girl he had mentioned. Shoemake testified that he asked about her age, and Keys told him she was 19. Shoemake said that he sat by Kim and that she initiated contact. Eventually they started to have sex. He said that they had oral and vaginal sex and that he ejaculated inside of her without a condom. Shoemake said that he had asked for a condom, but Keys had not given him one. Eventually, Keys came over and also had oral and vaginal sex with Kim. Shoemake said that Kim did not seem willing with Keys and that Keys wore a condom.

¶11.  After the rape, Keys said that he was going to the store and left the three of them alone. When he left, Kim told Shoemake and Prosser that Keys was keeping her there against her will. Upon hearing this, Shoemake and Prosser told her that they would get her out of there. From there, the three of them went to Shoemake's "baby momma's" house. Shoemake confirmed that he took a shower with Kim but that it occurred before he had learned her actual age. He said that Kim told him she was scared and did not want to be by herself and was having trouble standing. He said that while he watched his daughter, his

7

daughter's mother and Prosser spoke with Kim, which is when they learned her age. Kim then told them the address of her friend in Sumrall, and Shoemake and Prosser dropped her off there.

¶12. On cross-examination, Shoemake admitted that he gave multiple statements during the course of the investigation. In his first statement in April 2018, Shoemake said that he did not see Kim have sex with anybody. In his second statement, Shoemake said that he did not have sex with Kim at Keys's apartment but that he had sex with her in his car after leaving the apartment. In that second statement, Shoemake also said that he did not know if Keys had sex with Kim back at Keys's apartment, and he did not witness it. At trial, Shoemake said that he lied during those statements to protect Prosser. On cross-examination, Shoemake confirmed that in return for his testimony, the State would recommend reducing his sentence from thirty years in custody, with fifteen years to serve, down to thirty years in custody, with ten years to serve. On redirect, Shoemake also admitted that he never mentioned Keys in his previous statements because he was scared of him.

*Charikee Prosser's Testimony*

¶13. The State also called Charikee Prosser to testify. Prosser said that she was in a relationship with Shoemake for about five years and that in 2018 they had an "open relationship." She clarified that meant they would have sexual relations with other people. Prosser said that she met Keys through Shoemake and that Keys was Shoemake's drug dealer. She said she would often have sex with Keys in exchange for drugs. On the night

8

of January 14, 2018, Prosser said Keys had invited them over to do drugs and have sex. Keys also told them he had a girl over there for them to "have fun with," referring to Kim. Prosser said that she had not met Kim, but she had seen her at Keys's apartment before. She said that she saw Kim doing drugs that night and having sex with Shoemake. Prosser said she had sex with Keys, who then went over and began having sex with Kim.

¶14. After all sexual relations ceased, Prosser, Shoemake, and Kim told Keys they were going to leave and then come right back. Prosser said she lied about coming right back because she was scared of Keys and did not want to start trouble. The three of them went to Brittany's house and stayed there until 5:00 or 6:00 in the morning before eventually dropping Kim off. Prosser said that while at Brittany's house, Shoemake took a shower with Kim "[b]ecause [he] was messing with her, trying to have sex with her still and everything." She did not recall Kim being unable to stand up by herself.

¶15. Prosser then testified about the statement she gave to the police in April 2018. She said that she lied in that statement because she was scared of Keys and Shoemake. During cross-examination, Prosser confirmed that in her April statement, she said that she did not see anybody have sex with Kim and that she had seen Kim at Keys's apartment before. She also confirmed that she offered to give the police information regarding Keys's drug dealing.

*Jennifer Meredith's Testimony*

¶16. Meredith testified that while at the police department on the night of the alleged assault, Kim spoke with her about what had occurred that night. Kim told Meredith that

9

Keys (a/k/a "Dough Boy") had picked her up while she was walking to Bassfield. Keys then took Kim to his apartment in Sumrall and invited Shoemake and Prosser to come over. Kim said that Keys, Shoemake, and Prosser all kept giving her a pipe and telling her to smoke it. Keys and Prosser then started to have sex and Shoemake initiated intercourse with Kim. Kim told Meredith that the group mentioned her having sex with Keys, but she did not want to. Kim then told Meredith that Keys eventually did have sex with her.

¶17. During cross-examination, Meredith stated that although she spoke with Kim in January 2018, she did not give a written statement describing the conversation until the police department asked her to do so in September. Meredith testified that her statement in September was based on notes she took after speaking with Kim in January. Her complete statement was entered into evidence for the jury to consider.

¶18. After the State rested its case, Keys moved for a directed verdict, which the court denied. Keys did not testify in his defense. The defense presented no witnesses or evidence, but during cross-examination of the witnesses during the State's case, all the previous statements of the witnesses were entered into evidence. The defense then rested.

*Jury Instruction Conference*

¶19. The court then held a jury instruction conference. During the conference, the defense offered the proposed jury instruction D-6, which stated:

> The testimony of a witness may be discredited by showing that the witness testified falsely concerning a material matter, or by evidence that at some other time the witness said or did something or failed to say or do something which is inconsistent with the testimony the witness gave at this trial.

10

Earlier statements of a witness were not admitted in evidence to prove that the contents of those statements are true. You may consider the earlier statements only to determine whether you think they are consistent or inconsistent with the trial testimony of the witness and therefore, whether they affect the credibility of the witness.

If you believe that a witness has been discredited in this matter, it is your exclusive right to give the testimony of that witness whatever you think it deserves.

The judge refused that proposed instruction and said the following:

It's confusing. It's covered in others and I just don't think it's appropriate. The jury will be strictly instructed that it is their responsibility to weigh the testimony of each witness and make the appropriate findings as to how much cred[i]bility or lack of cred[i]bility they so choose to give. So I will deny it.

The defense made no arguments as to why the instruction should have been granted. The trial court did, however, give instruction C-1, which covered weight of witness testimony generally:

As sole judges of the facts in this case, you determine what weight and what credibility will be assigned the testimony and supporting evidence of each witness in this case. You are required to use your good common sense and sound, honest judgment in considering and weighing the testimony of each witness. . . .

¶20. After the conference, the judge instructed the jury. After deliberations, the jury found Keys guilty of statutory rape. The court sentenced Keys to serve thirty years in the custody of the Mississippi Department of Corrections. The court ordered him to pay at least $5,000 in fines and register as a sex offender for life. After his post-trial motions were denied, Keys appealed.

¶21. On appeal, Keys argues that (1) the trial court erred by refusing instruction D-6

regarding impeachment by a prior inconsistent statement and that (2) the verdict was against the overwhelming weight of the evidence.

## STANDARD OF REVIEW

¶22.  "[T]he standard of review for the denial of jury instructions is abuse of discretion." *Newell v. State*, 49 So. 3d 66, 73 (¶20) (Miss. 2010) (citing *Davis v. State*, 18 So. 3d 842, 847 (Miss. 2009)).  "[T]he instructions actually given must be read as a whole.  When so read, if the instructions fairly announce the law of the case and create no injustice, no reversible error will be found."  *Id*.  (quoting *Rubenstein v. State*, 941 So. 2d 735, 785 (¶224) (Miss. 2006)).  "When serious doubt exists as to whether an instruction should be included, the doubt should be resolved in favor of the accused."  *Id*. at 74 (¶20) (citing *Davis*, 18 So. 3d at 847).  "On appellate review of the trial court's grant or denial of a proposed jury instruction, our primary concern is that 'the jury was fairly instructed and that each party's proof-grounded theory of the case was placed before it.'"  *Banyard v. State*, 47 So. 3d 676, 681 (¶11) (Miss. 2010) (quoting *Young v. Guild*, 7 So. 3d 251, 259 (¶24) (Miss. 2009)).

¶23.  On review of a challenge to the weight of the evidence, this Court "view[s] the evidence in a light most favorable to the verdict, and the verdict will be disturbed only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice."  *Bowser v. State*, 182 So. 3d 425, 431 (¶15) (Miss. 2015) (internal quotation marks omitted).

## DISCUSSION

## I. Whether the trial court erred by refusing the defense's proposed jury instruction on impeachment by a prior inconsistent statement.

¶24. "[A] trial judge is not under an obligation to grant redundant instructions." *Jones v. State*, 203 So. 3d 600, 613-14 (¶43) (Miss. 2016) (citing *Swann v. State*, 806 So. 2d 1111, 1117 (¶23) (Miss. 2002)). In *Swann*, the defendant put forth an instruction that stated:

> If you believe inconsistent statements were made, you may consider the inconsistencies in evaluating the believability of [the witness's] testimony.

*Swann*, 806 So. 2d at 1117 (¶22). The Supreme Court said that refusing such an instruction in that case would have been error if not for the other instructions provided to the jury. *Id.* at (¶23). The instruction the jury did hear, which was found sufficient, stated:

> If upon a consideration of the evidence in this case, you find that there is a conflict in testimony of the witnesses, it is your duty to settle this conflict.
> . . . .
>
> You may also consider their personal credibility in so far as it may legitimately appear from the trial of this case.

*Id.* The Supreme Court found that the jury had been presented with the court's instruction, informing them of their duty to settle conflicts between witnesses' testimonies and that they may consider the personal credibility of a witness as it was made evident at trial. *Id.* at (¶24). Furthermore, Swann had the opportunity to cross-examine witnesses regarding their inconsistent statements. *Id.* Lastly, Swann's closing argument discussed how the witness was untrustworthy due to his previous forgery convictions and prior inconsistent statements. *Id.* Based on the instruction, the cross-examination, and the closing arguments, the Supreme Court found that it was reasonable to believe that the jury took the witness's prior

13

inconsistent statement into account. *Id.* The Court found no error in the trial court's refusal to give the defense's proposed instruction. *Id.*[6]

¶25. We find the facts and analysis in *Swann* to be controlling in the present case. Keys argues that the trial court erred by not presenting the proposed instruction D-6 to the jury. As discussed above, this instruction informed the jury that "if you believe that a witness has been discredited in this matter, it is your exclusive right to give the testimony of that witness whatever you think it deserves." The trial court refused this instruction and instead presented C-1, which, among other things, stated, "[Y]ou determine what weight and what credibility will be assigned the testimony and supporting evidence of each witness in this case." Keys also cross-examined each witness and emphasized their prior inconsistent statements. Lastly, Keys's closing argument focused almost entirely on the fact that Kim, Prosser, and Shoemake had made prior inconsistent statements. "Given the jury instructions, the cross-examination of [the witnesses], and [Keys's] closing argument, it is reasonable to believe that the jury did take [the witnesses'] prior inconsistent statements into account." *Id.*

¶26. Furthermore, the Court also provided a cautionary instruction regarding co-defendant Shoemake's testimony, which stated:

---

[6] *See also Bolden v. State*, 23 So. 3d 491, 501 (¶¶32-34) (Miss. Ct. App. 2009) (holding that because both parties referred to the prior inconsistent statements of witnesses in their closing arguments and attempted to explain those inconsistencies in a way that supported the party's proposed explanation of events and because the jury was instructed on its right to weigh the credibility of witnesses, the jury instruction specifically informing the jury that it must disregard testimony that was contradicted by a prior inconsistent statement was not necessary).

14

The Court instructs the jury that the law looks with suspicion and distrust on the testimony of an alleged co-defendant, and requires the jury to weigh that testimony with great care and suspicion. You should weigh the testimony from an alleged co-defendant, and passing on that weight, if any, you should give this testimony, you should weigh it with great care and caution, and look upon it with distrust and suspicion.

Based on the general C-1 instruction, which informed the jury of its duty and power to weigh the credibility of all witnesses' testimonies, as well as the co-defendant instruction, which cautioned the jury regarding the testimony of Shoemake, the jury was fairly instructed on the law, and the defendant's proof-grounded theory of the case was placed before the jury. *Banyard*, 47 So. 3d at 681 (¶11). Thus, the circuit court did not err by refusing Keys's D-6 instruction on impeachment.

## II. Whether the verdict was against the overwhelming weight of the evidence.

¶27. On review of a trial court's decision to deny a new trial based on the weight of the evidence, this Court never reweighs the evidence, assesses witness credibility, or resolves conflicts between the evidence. *Little v. State*, 233 So. 3d 288, 292 (¶20) (Miss. 2017). Rather, "when the evidence is conflicting, the jury will be the sole judge of the credibility of witnesses and the weight and worth of their testimony." *Id.* (quoting *Gathright v. State*, 380 So. 2d 1276, 1278 (Miss. 1980)); *see also Lenoir v. State*, 222 So. 3d 273, 278 (¶21) (Miss. 2017). As such, a "verdict will be disturbed only when it is so contrary to the overwhelming weight of the evidence that to allow it to stand would sanction an unconscionable injustice." *Bowser*, 182 So. 3d at 431 (¶15) (internal quotation marks omitted).

15

¶28. This Court addressed a similar argument Keys relies on in *Ross v. State*, 51 So. 3d 977 (Miss. Ct. App. 2010). In that case, Tyshunna Ross, a thirty-seven-year-old woman, was indicted on one count of sexual battery and one count of gratification of lust for her relationship with a twelve-year-old boy, A.B. *Id.* at 978 (¶1). At trial, the A.B. testified that Ross invited A.B. and two of his friends, both fourteen, to "hang out" with her at her home. *Id.* at 979 (¶2). Ross and the children smoked cigarettes and drank vodka, which A.B. consumed four to five shots of. *Id.* at (¶3). The group then went into the woods where Ross kissed A.B. and had him fondle her breasts. *Id.* The next day, Ross contacted A.B. and told him her boyfriend had beaten her and that she needed a place to stay. *Id.* at (¶4). A.B. offered to let Ross stay with him and snuck her into his room. *Id.* While there, Ross fondled A.B., and they proceeded to have sex. *Id.* at 979-80 (¶5). Afterward, A.B.'s mother entered the room and discovered the two. *Id.* at 980 (¶5). Ross hid under the blankets. *Id.* The mother, unaware that Ross was an adult, assumed A.B. was with a girl his age and questioned A.B. about what he was doing, to which A.B. responded to his mother that they had not done anything sexual. *Id.* at 980-81 (¶¶5-6). Ross later left with a friend. *Id.* at 981 (¶6).

¶29. The next day, after learning from a friend that Ross had given A.B. alcohol on July 3, A.B.'s mother took A.B. to the police department to give a statement regarding the events of that day. *Id.* at (¶7). A.B. told the police that he and his friend had kissed and fondled Ross on July 3, and on July 4 Ross had touched his penis and he had fondled her breasts but denied that they had sex. *Id.* A.B. then went to the Child Advocacy Center, where a forensic

16

interview was conducted. *Id.* During the interview, A.B. again did not disclose that he and

Ross had sex. *Id.* On July 13, A.B. told his mother the "full truth" that he and Ross had sex

on July 4. *Id.* A.B.'s mother took A.B. to the police department again, where he recanted

his previous statement and gave a statement that confirmed he and Ross had sex on July 4.

*Id.*

¶30.    At trial, the full audio recording of A.B.'s second statement was played for the jury,

and detectives with the police testified for the State. *Id.* at 981-82 (¶¶7-8). A friend of

Ross's testified for the State, saying that on July 4 he had dropped Ross off near A.B.'s

home, after Ross had told him it was the home of "a friend." *Id.* at 982 (¶9). Ross did not

testify, *id.* at (¶10), but the defense did introduce her statement to the police, in which she

said she did provide alcohol to A.B. and his friends and that she was present in A.B.'s room

on July 4, but that no sexual contact occurred. *Id.* at 921 (¶8). Ross was subsequently

convicted of both counts and appealed. *Id.* at 982 (¶10).

¶31.    On appeal, Ross argued that the weight of the evidence was not enough to support her

conviction. *Id.* at (¶11). Ross argued that A.B.'s initial denial of sexual contact, his

staggered disclosure, and inconsistencies with his testimony undermined the credibility of

his testimony. *Id.* at 982 (¶13). She further argued that A.B.'s description of the physical

act of intercourse was "impossible or improbable." *Id.* at 982-83 (¶13). Regarding A.B.'s

initial denials, this Court stated:

> "[I]t is common for a victim of sexual abuse to be embarrassed and to initially
> deny that the crimes occurred." A.B. testified that he initially denied sexual

17

> contact with Ross because he was afraid of what would happen and that he feared he would "get in trouble." . . . *A.B. also stated that during the initial police and CAC interviews, he was embarrassed by the events and felt uncomfortable with the interviewers.*

*Id*. at 983 (¶14) (emphasis added) (citation omitted). We also noted that A.B. was intoxicated during the events of July 3, which explained some of the inconsistencies with his testimony regarding events that occurred on that day. *Id*.

¶32. Ultimately, our Court found that since the defense primarily hinged its argument on the credibility of the State's witnesses, the jury should be the sole judge. *Id*. at 984-85 (¶16) (citing *Nix v. State*, 8 So. 3d 141, 146 (¶26) (Miss. 2009)). We also noted that at trial, Ross brought all these credibility issues to the attention of the jury, and the jury still found A.B.'s testimony credible enough to support the guilty verdict. *Id*. at 983-84 (¶16). Lastly, we said that A.B.'s testimony was not "inherently implausible, nor was it so seriously impeached that no reasonable juror could find it credible." *Id*. Based on the above, we refused to find that the verdict was against the overwhelming weight of the evidence. *Id*.

¶33. Our analysis in the present case is very similar to *Ross*. Kim provided statements to the police, hospital, and CAC interviewer that she later contradicted. However, when asked why she did not originally say that Keys also raped her, she said she was "embarrassed" due to the presence of her parents and friends of her father being present during the interviews. At trial, both Cowart and Dixon testified that it was not uncommon for child victims not to tell the full story during their interviews. Further, it is undisputed that Kim was under the influence of drugs and alcohol on the night of the abuse, as well as still under the influence

during her first statements to the police and hospital staff. Generally, the uncorroborated testimony of a victim of sexual abuse can be sufficient to sustain a conviction. *Massey v. State*, 992 So. 2d 1161, 1164 (¶14) (Miss. 2008). Kim's testimony was corroborated, albeit by less-than-stellar witnesses. However, regardless of the questionable credibility of Shoemake and Prosser, all this testimony and evidence was presented to the jury, and the jury still found Kim's testimony to be credible enough to support a guilty verdict.

¶34. For the above-stated reasons, we find that the trial court did not abuse its discretion by denying Keys's motion for a new trial because the verdict was not against the overwhelming weight of the evidence.

## CONCLUSION

¶35. The trial court did not err by refusing the defense instruction on impeachment based on prior inconsistent statements because the court's instruction sufficiently stated the law, and the defendant's counsel sufficiently cross-examined witnesses and made arguments during the closing. Further, the trial court did not abuse its discretion by denying the motion for a new trial based on the weight of the evidence. For the above reasons, we affirm the conviction and sentence.

¶36. **AFFIRMED.**

**BARNES, C.J., CARLTON AND WILSON, P.JJ., GREENLEE, WESTBROOKS, LAWRENCE, McCARTY AND EMFINGER, JJ., CONCUR. SMITH, J., NOT PARTICIPATING.**